UNITED STATES of America,
Plaintiff–Appellee,

v.

Gail M. LEVINE, Defendant–Appellant.

No. 93–1468.

United States Court of Appeals,
Tenth Circuit.

Dec. 2, 1994.

Raymond P. Moore, Asst. Federal Public Defender, Denver, CO, (Michael G. Katz, Federal Public Defender, with him on the briefs), for defendant-appellant.

Thomas M. O'Rourke, Asst. U.S. Atty., Denver, CO, (Henry L. Solano, U.S. Atty., with him on the brief), for plaintiff-appellee.

Before EBEL, HOLLOWAY, and KELLY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Defendant Gail M. Levine was convicted pursuant to 18 U.S.C. § 1365(b) of one count of tainting a consumer product with intent to cause serious injury to the business of any person where the consumer product affects interstate or foreign commerce. She appeals that conviction. Jurisdiction in the district court was conferred by 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and reverse.

### I

On July 8, 1993, Levine was charged by indictment with twenty-four violations of law, including one count of tampering with a can of Diet Pepsi in violation of 18 U.S.C. § 1365(b). Only the tampering count is the subject of this appeal.[1]

On the morning of June 15, 1993, Levine entered a King Soopers supermarket in Aurora, Colorado, and approached the customer service counter with a can of Diet Pepsi from a six-pack she had. Levine asked the clerk at the service counter to open the can for her. The clerk opened the can and returned it to Levine. Levine then gave the clerk a check to cash. While the clerk was cashing the check, Levine placed a syringe containing a needle into the open can of Diet Pepsi.[2] Levine handed the can back to the clerk, claiming that she heard something in the can. The clerk took the can, emptied its contents into a container, and discovered the syringe. The store manager took possession of the can, the syringe, and the remaining five unopened Diet Pepsi cans. Believing that Levine had paid for the six-pack of Diet Pepsi, the manager had the clerk refund the cost to Levine.

After leaving the store, Levine contacted local television stations. Those stations interviewed her and her story ran on local news broadcasts in the Denver area. During the evening of June 15, Levine telephoned a number of individuals she knew and either asked them to watch for her on TV or asked whether they had seen her on TV. Among those persons Levine contacted was Myra Young, Levine's manicurist. Young told Levine that the news stories suggested that Levine had put the syringe in the can of Diet Pepsi. Later that same evening, Levine again contacted Young and said that she (Levine) should probably get an attorney. Levine then asked Young if she knew any attorneys and Young recommended her brother, Dale Sadler.

The following day, June 16, Levine contacted Sadler to inquire whether she had a claim in connection with the syringe in the Diet Pepsi can. Sadler referred Levine to a private investigator, Arthur Baxter. Baxter went to the Levine residence that same day and signed a contract with Levine in which

---

1. The other twenty-three counts of the indictment related to Levine's receipt of various Supplemental Security Income checks. Levine pleaded guilty to three of these charges, and the remaining twenty counts were dismissed. None of these counts are related to or raised in this appeal. Therefore, we do not address them.

2. The needle was attached to the syringe. Levine is diabetic and had a prescription for syringes for insulin injections.

he agreed to "investigate case to completion of claim and court case." Addendum to Appellee's Brief, doc. 22 (government exhibit 43). At this meeting Baxter interviewed both Levine and her husband.

Later that day, a videotape of the incident came to light. Appellant's Opening Brief at 7; see Addendum, docs. 1–15 (exhibits 4–18). The following day, June 17, an arrest warrant was issued for Levine, and she was arrested later that day.

On July 8, 1993, a grand jury returned an indictment against Levine which included a charge stemming from her placing the syringe in the can of Diet Pepsi. Count 24 of the indictment charged: "On or about June 15, 1993, in the State and District of Colorado, GAIL M. LEVINE, with intent to cause serious injury to the business of Pepsi–Cola Company, knowingly tainted a 12–ounce can of Diet Pepsi, which was a consumer product that affected interstate commerce." This count was the only count that went to trial. The trial began on September 7, 1993, in the district court. On September 9 the jury returned a guilty verdict. On November 12 Levine was sentenced to 36 months' imprisonment on this count.[3] Judgment was entered on November 18, 1993, and Levine filed a notice of appeal on November 19.

Levine raises two issues on appeal. First, she argues that as a matter of law her actions did not constitute a violation of 18 U.S.C. § 1365(b). Second, she says that the district court committed reversible error by improperly instructing the jury.

## II

### Sufficiency of the Evidence

Levine contends that as a matter of law her conduct did not violate 18 U.S.C. § 1365(b), properly interpreted. Appellant's Opening Brief at 13–14. Levine argues that in order for there to be a violation of § 1365(b), the tainted item must affect interstate commerce at or after the tainting. Appellant's Opening Brief at 14. She says that the interstate commerce nexus was absent

for two reasons: the can of Diet Pepsi which Levine tainted did not travel in or otherwise affect interstate commerce; and even if the can is presumed at some point to have been in the stream of commerce, the can was removed from that stream before it was tainted and therefore Levine's conduct was beyond the scope of § 1365(b). Id. The government argues that all it need show is that the consumer product had an effect on interstate commerce at some point, whether before, during or after the tainting. Appellee's Brief at 18.

■ In reviewing the sufficiency of the evidence "we examine, in the light most favorable to the government, all of the evidence together with the reasonable inferences to be drawn therefrom and ask whether any rational juror could have found the essential elements of the crime beyond a reasonable doubt." United States v. Arutunoff, 1 F.3d 1112, 1116 (10th Cir.), cert. denied sub nom. DeVries v. United States, —— U.S. ——, 114 S.Ct. 616, 126 L.Ed.2d 580 (1993). We consider both direct and circumstantial evidence and accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses. United States v. Dirden, 38 F.3d 1131, 1142 (10th Cir.1994). If we find the evidence to be insufficient, the Double Jeopardy Clause requires that we direct a judgment of acquittal. Burks v. United States, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

■ Our review of the district court's interpretation of the statute is de novo. United States v. Martinez, 890 F.2d 1088 (10th Cir.1989), cert. denied, 494 U.S. 1059, 110 S.Ct. 1532, 108 L.Ed.2d 771 (1990). In construing the scope of a statute, we must first consider its language. United States v. Cardenas, 864 F.2d 1528, 1534 (10th Cir.) (citing Russello v. United States, 464 U.S. 16, 20, 104 S.Ct. 296, 299, 78 L.Ed.2d 17 (1983)), cert. denied, 491 U.S. 909, 109 S.Ct. 3197, 105 L.Ed.2d 705 (1989). Criminal statutes will not be construed to include anything beyond their letter. Cardenas, 864 F.2d at 1535

---

3. As for the three counts to which she pled guilty, Levine was sentenced to 12 months on count 1 and 51 months each for counts 2 and 3. These sentences were to run concurrently with each other and with the 36 month sentence for count 24, the conviction at issue in this appeal.

(citing *United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971)); however, a criminal statute should not "be construed so strictly as to defeat the obvious intention of the legislature." *Barrett v. United States,* 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976) (citation omitted).

Section 1365(b) provides:

Whoever, with intent to cause serious injury to the business of any person, taints any consumer product or renders materially false or misleading the labeling of, or container for, a consumer product, if such consumer product affects interstate or foreign commerce, shall be fined not more than $10,000 or imprisoned not more than three years, or both.

We are presented with two questions of interpretation of § 1365(b). First, what is meant by "consumer product" in this case. Second, what is meant here by "affects interstate commerce."

A

**Consumer Product**

■ The statute defines "consumer product" as

(A) any "food", "drug", "device", or "cosmetic", as those terms are respectively defined in section 201 of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. 321); or

(B) any article, product, or commodity which is customarily produced or distributed for consumption by individuals for purposes of personal care or in the performance of services ordinarily rendered within the household, and which is designed to be consumed or expended in the course of such consumption or use[.]

18 U.S.C. § 1365(g)(1). It is clear that a soft drink falls within this definition. However, this definition does not resolve the issue before us. Here, "consumer product" could have three possible meanings: (1) all diet cola, regardless of brand name; (2) all Diet Pepsi; or (3) the specific can of Diet Pepsi which Levine tainted. We believe the lan-

guage of the statute points to the third and narrowest definition.

Subsection (b) proscribes two types of wrongful conduct intended to cause serious injury to the business of any person: (1) tainting any consumer product and (2) rendering materially false or misleading the labeling of or container for a consumer product, if in either case the "consumer product" affects interstate or foreign commerce. The use of "consumer product" in the second context makes sense only if "consumer product" means a specific unit of a good. Only individual units of Diet Pepsi have labels or containers which can be rendered materially false or misleading. All Diet Pepsi and all diet cola do not. To read "consumer product" to mean all Diet Pepsi or all diet cola would render meaningless the proscription against altering the labeling of or container for a consumer product. We will not construe a statute in a way that renders words or phrases meaningless, redundant or superfluous. *Bridger Coal Company/Pacific Minerals, Inc. v. Director, Office of Workers' Compensation Programs, United States Dep't of Labor,* 927 F.2d 1150, 1153 (10th Cir.1991). And it is difficult to imagine a scenario making it possible to taint all Diet Pepsi or all diet cola.

We hold, therefore, that "consumer product" means the specific item which is tainted, in this case the 12–ounce can of Diet Pepsi into which Levine put the syringe. *See United States v. Nukida,* 8 F.3d 665, 669 (9th Cir.1993) (in a case under § 1365(a) court observed that "one of the material elements of the offense defined by section 1365 is that the *tampered product* affect interstate commerce") (emphasis added).

B

**Effect on Interstate Commerce**

■ In the only reported decision interpreting § 1365, *United States v. Nukida, supra,*[4] the Ninth Circuit considered the government's appeal from a district court judgment dismissing, on motion under Fed. R.Crim.P. 12(b), five counts of a sixteen-

4. *Nukida* was decided after Levine's trial, and, therefore, was not available to the district court.

count indictment under § 1365(a). That portion of the statute prohibits tampering with any consumer product that affects interstate or foreign commerce with reckless disregard for danger of death or bodily injury, manifesting extreme indifference to such risk.[5]

The defendant, Nukida, was a nurse at a medical care facility in California. She administered intravenous medications to three patients. Two of the patients became seriously ill and lost consciousness from dangerously low levels of blood sugar. The third patient also suffered low blood sugar. An investigation of the intravenous bags from which the patients' medication was administered revealed that the bags had been punctured by syringe needles and contaminated with insulin. Additional insulin-tainted bags were discovered in the supply room. As a result of these contaminations, Nukida was charged with sixteen counts of tampering under 18 U.S.C. § 1365(a).

Nukida moved to dismiss pursuant to Federal Rule of Criminal Procedure 12(b), arguing that her acts did not affect interstate commerce and therefore the district court lacked jurisdiction. The court dismissed five of the sixteen counts, holding that when the I.V. bags were connected to the patients, the medications left the stream of commerce. 8 F.3d at 668. Therefore the court held that Nukida's injection of insulin into those bags which were already attached to the patients did not affect interstate commerce. *Id.* "[T]he five I.V. bags 'had reached their ultimate destination and were being consumed at the time the tampering occurred. Therefore, at that time the consumer products were neither in nor affecting interstate commerce.'" *Id.* The district court refused to dismiss the remaining eleven counts of the indictment, holding that the tainted medications in those bags in the storeroom re-

mained in the stream of commerce because the bags had not yet been attached to patients at the time Nukida allegedly contaminated them. *Id.*

The Ninth Circuit reversed, holding that Nukida's motion to dismiss amounted to a premature challenge to the sufficiency of the evidence, a matter not appropriate for pretrial determination. 8 F.3d at 669–72. "[W]hether the product at issue, in this case the intravenous solutions, had lost its interstate character is a question of fact for the jury." *Id.* at 671. Therefore, "the district court jumped the gun by attempting to resolve this factual issue before trial." *Id.*

Here, the government argues that "[t]o establish the interstate commerce element, the government can prove effects that occur before, during or after the prohibited conduct." Appellee's Brief at 18. In support of this proposition the government relies on the following language from *Nukida:* "section 1365(a) draws no distinction among effects that occur before, during, or after the tampering; it merely states that the product must affect interstate commerce." 8 F.3d at 671. Although this language suggests that events prior to tainting can serve as the interstate commerce nexus, we do not read *Nukida* to suggest that pre-tainting events are sufficient to satisfy the interstate commerce requirement by considering the movement of ingredients before the canned product in question was produced. We agree that we should consider any movement of the particular canned product that was later tainted, from the time it was produced until it is taken out of interstate commerce by an end user. The statement the government relies on was part of the Ninth Circuit's explanation of why the district court had erred in holding that *post*-tampering economic effects could not satisfy the interstate com-

---

5. Section 1365(a) provides:

   Whoever, with reckless disregard for the risk that another person will be placed in danger of death or bodily injury and under circumstances manifesting extreme indifference to such risk, tampers with any consumer product that affects interstate or foreign commerce, or the labeling of, or container for, any such product, or attempts to do so shall [be guilty of an offense against the United States].

Construed in *pari materia*, 2B Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 51.03 at 138.40 (5th ed. 1992), we believe "consumer product" as used in § 1365(b) should carry the same meaning as "consumer product" throughout § 1365. Similarly, the phrase "affects interstate commerce" which appears in other subsections should be given the same meaning as in § 1365(b). Therefore, the statutory interpretation of § 1365(a) in *Nukida* is instructive for our interpretation of § 1365(b).

merce requirement. The district court had "held as a matter of statutory interpretation that an impact upon interstate commerce occurring after the tampering of a product does not affect commerce within the meaning of section 1365(a)." 8 F.3d at 671. The Ninth Circuit disagreed: "there is no reason to preclude *post*-tampering economic effects." *Id.* at 672 (emphasis added).

The Ninth Circuit did not directly address whether *pre*-tainting events can satisfy the interstate commerce requirement. However, it is implicit in *Nukida* that they will not. First, the court stated that "[t]he face of the statute reveals that one of the material elements of the offense defined by section 1365 is that the *tampered product* affect interstate commerce." *Id.* at 669 (emphasis added). Pre-tainting events are not effects caused by the "tampered product." Second, the Ninth Circuit stated that as the "district court recognized, there are two ways to demonstrate the requisite nexus with interstate commerce." *Id.* at 670. These two ways were identified as "[1] the government may prove that the [consumer product was] 'in commerce' when the alleged tampering occurred.... [2] the government may prove that the tampering had an actual economic impact on interstate commerce." *Id.* at 670.

Under both of these approaches, the effects on interstate commerce occur either at the time of or after the tampering, not before. Pre-tainting events would not fall within either of these methods of proof and thus could not supply the proof necessary to satisfy the interstate commerce element. Moreover, the Ninth Circuit stated that "whether the product at issue ... has lost its interstate character is a question of fact for the jury." *Id.* at 671. If pre-tainting events were sufficient, then whether a product had lost its interstate character would be irrelevant; instead the inquiry would be whether the product *ever* had an interstate character. Thus the Ninth Circuit did not hold that pretainting events could satisfy the interstate

commerce requirement of § 1365(a). In sum, we read *Nukida* to hold that the effect on interstate commerce must occur at or after the tainting, and we agree with that view.[6]

In any event there is sufficient ambiguity in § 1365 to warrant our examination of the legislative history. *See United States v. Abreu,* 962 F.2d 1447, 1450 (10th Cir.1992) (en banc) ("[w]hen the plain language of a statute does not unambiguously reveal its meaning, we turn to the legislative history."), *vacated on other grounds,* —— U.S. ——, 113 S.Ct. 2405, 124 L.Ed.2d 630 (1993); *see also Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984).

We feel that the legislative history supports our interpretations of § 1365. The Federal Anti–Tampering Act was enacted in the wake of seven poisoning deaths in the Chicago area in 1982. These deaths were attributed to cyanide-tainted capsules of a widely-used pain reliever. *See* H.R.Rep. No. 93, 98th Cong., 1st Sess. 3 (1983) ("House Report"), *reprinted in* 1983 U.S.C.A.A.N. 1257, 1257. Following these deaths there were numerous copycat poisonings and other product tamperings as well as false claims that products had been tampered with. *Id.* Consumer confidence was markedly affected. *Id.* In light of these incidents, in December 1982 Congress passed an anti-tampering provision along with other anti-crime measures. *Id.* at 3, 1983 U.S.C.A.A.N. at 1258. However, President Reagan vetoed this bill. Congress passed a subsequent bill which became law on October 13, 1983. The Federal Anti–Tampering Act, Pub.L. No. 98–127, § 2, 97 Stat. 831 (1983) (codified as amended at 18 U.S.C. § 1365).

The House Report states that the statute is not intended to apply once the consumer product leaves the stream of commerce and that the intent was to limit federal jurisdiction to those "instances where the Federal interest is clear." House Report at 4, 1983

---

**6.** We believe there is a third way by which the interstate commerce requirement can be met which is consistent with the two theories spelled out in *Nukida* and discussed above. If a consumer product is no longer in the stream of commerce when it is tainted, but is placed back into the stream of commerce after it is tainted, the interstate commerce requirement and other elements of a § 1365(b) violation might be found, regardless of whether there is an actual economic impact which results from the tainting.

U.S.C.A.A.N. at 1259. "Once the product is sold, and assuming it is not returned to the field of interstate or foreign commerce, the Federal role should end." *Id.*[7] The House bill, H.R. 2174, proscribed only acts of tampering where the defendant recklessly disregarded the risk that the tampering would cause death or serious bodily injury. The scope was thus limited to the tamperings which posed a threat of harm to human health. House Report at 3–4, 1983 U.S.C.A.A.N. at 1258. H.R. 2174 did not reach tamperings intended to harm business but which posed no health threat. House Report at 5, 1983 U.S.C.A.A.N. at 1260.

The Senate bill, S. 216, did reach such conduct, and Congress adopted the broader Senate approach. However, the Senate Report, like the House Report, indicated that federal jurisdiction should be limited. The Senate Report noted that S. 216 was not intended to "cover tampering within the home where the bottle is not, or is not intended to be, placed on the retail shelf. Thus, the original goal of S. 216 to limit Federal jurisdiction to cases which are not more appropriately left to State and local jurisdictions is preserved." S.Rep. No. 69, 98th Cong., 1st Sess. 9 (1983). Thus, the legislative history indicates that the Anti–Tampering Act should not be construed to cover all product tamperings.

Reading §1365(b) in light of both the House and Senate Reports leads us to conclude that the requisite effect on interstate commerce must occur at or after the tainting. Were pre-tainting events sufficient to supply the interstate commerce element, then the statute would reach many tamperings in the home because numerous consumer products have been in interstate commerce at some point.[8] However, the statute on its face does not reach all taintings and the legislative history indicates that neither the House nor the Senate intended for the statute to so

invade the province of state criminal jurisdiction. The only reasonable interpretation we see in light of both the language of the statute and the legislative history is that the effect on interstate commerce must occur at or after the tainting.

Moreover, the interstate commerce requirement is phrased in the present tense: "if such consumer product *affects* interstate or foreign commerce." 18 U.S.C. § 1365(b) (emphasis added). If Congress had meant to include pre-tainting events, it would have made more sense to use the past or past perfect tenses (i.e., "affected" or "had affected" interstate commerce). The use of these past tenses logically would have included events prior to the time of tainting. The use of the present tense, on the other hand, further supports our holding that the consumer product must affect interstate commerce at or after the tainting. "Affects" suggests that the consumer product must have either a present effect or an effect in the future, and appears to exclude pre-tainting events.

In sum, we are not persuaded by the government's argument that the effect on interstate commerce can be one produced before the tainting. Congress intended otherwise and we hold that the effect on interstate commerce must occur at or after the tainting, in addition to holding, as explained earlier, that "consumer product" in § 1365(b) means the particular item tainted by the person committing the offense.

■ We agree with the Ninth Circuit that whether the interstate commerce requirement is met is a question of fact. *Nukida,* 8 F.3d at 671. *See also Suntar Roofing, Inc.,* 897 F.2d at 478. Thus, it is for the jury to decide (1) whether the product was in interstate commerce at the time of tainting; we are persuaded that the canned "consumer product" is in interstate commerce during its entire commercial journey if part of that

---

7. *See* our note 6, *supra.*

8. Although the evidence indicates that here the can of Diet Pepsi never left Colorado during its existence, it is well settled that interstate commerce can be affected by purely intrastate transactions. *See United States v. Darby,* 312 U.S. 100, 118–21, 61 S.Ct. 451, 459–61, 85 L.Ed. 609

(1941); *United States v. Suntar Roofing, Inc.,* 897 F.2d 469, 478 (10th Cir.1990) (interstate commerce may include entirely intrastate transactions where some or all defendants are not engaged in interstate commerce, and some or all acts are within a state "if the activities substantially and directly affect interstate commerce").

journey involves movement across state lines; (2) if the product was not in interstate commerce at the time of tainting, whether after tainting it was returned to interstate commerce; we are persuaded that if a "consumer product" is taken off the shelf, tainted, and then returned to the shelf, it would still be in interstate commerce when the tainting occurred; or (3) whether there was an actual impact on interstate commerce as a result of the tainting of the product. If the jury finds that the facts before it meet any of these three criteria, it may find that the interstate commerce requirement is satisfied.

■■■ Levine contends that the facts fail to establish a violation of the law here. However, we believe there was sufficient evidence from which a jury could have found the requisite connection between the tainted Diet Pepsi and interstate commerce. Mr. Stevenson, the general manager of the Pepsi Cola facility in Denver where the can of Diet Pepsi was produced,[9] testified that after the incident, his facility received a flood of calls from concerned customers. He said "[t]here was a major effort on my part to convince them to continue to stock our products on their shelves." 10 R. at 68. Stevenson described one specific incident where a public recreation facility requested that all of its vending machines be taken away. He also testified that media reports concerning the incident had recommended that beverages would be safely consumed if poured into a glass before consuming instead of being drunk straight from the can. From this testimony a jury could infer that sales of Pepsi products in interstate commerce would decline. Thus, Stevenson's testimony would support a jury finding that there was an actual injury to the company as a result of the tainting of the can of Diet Pepsi.

We hold that the evidence was sufficient for the jury to find Levine guilty under § 1365(b), properly interpreted, and Levine's first contention on appeal therefore fails. Of course, for the jury to have correctly found Levine guilty, it must have been instructed properly. Levine contends it was not. We therefore turn to the question of the jury instructions.

### III

### Jury Instructions

■■■ Levine contends that the district court erroneously instructed the jury on various issues of law with respect to the interstate commerce requirement of § 1365(b). We review jury instructions de novo to determine the propriety of the instructions which were objected to at trial. *United States v. Mullins,* 4 F.3d 898, 900 (10th Cir.1993). We do not view the individual instructions in isolation; rather, we examine the impact of the instructions as a whole to determine whether the jury was misled. *Id.* The key is whether the jury had an understanding of the issues and of its duty to determine those issues. *United States v. Cardall,* 885 F.2d 656, 673 (10th Cir.1989). We reverse only for prejudicial error. *Id.*

■■■ With respect to tendered jury instructions which were refused, "so long as the charge as a whole adequately states the law, the refusal to give a particular requested instruction is not an abuse of discretion." *Suntar Roofing, Inc.,* 897 F.2d at 473. However, a conviction cannot stand if there was an equivocal direction on a basic issue. *Bollenbach v. United States,* 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

Levine raises four claims with respect to jury instructions. We address them in order.

### A

■■■ Levine claims that the district court erroneously instructed the jury that the interstate movement of components or ingredients of the can of Diet Pepsi which occurred before the can was produced could satisfy the interstate commerce requirement of § 1365(b). Appellant's Opening Brief at 24. The district court instructed:

Interstate commerce means trade, or business, or travel between or among the states. As used in Title 18, United States

---

9. The Denver Pepsi–Cola facility produces tens of millions of cases of products annually. It is one of the largest bottling facilities for Pepsi–Cola in terms of sales and case volume.

Code, section 1365, the phrase "affected interstate commerce" means, in any manner or to any degree, to move, or to travel, *or to be involved in the movement, trans- portation or flow of a consumer product in commerce between or among different states.* It is not necessary for the government to prove that the defendant knew or intended that a consumer product was affecting interstate commerce. The government must prove beyond a reasonable doubt, however, that the defendant tainted a consumer product that did, in fact, "affect" interstate commerce.

The government may meet its burden with respect to this element by proving a connection between interstate commerce and the consumer product described in the indictment. *It is not necessary for the government to prove that the defendant knew that the consumer product or its components had previously travelled in interstate commerce.*

Appellant's Opening Brief, Exhibit A at 7 (emphasis added). The defense objected to the inclusion of the phrase "or its components," and argues that the "practical effect of the instruction ... was that the jury was told that components 'count' and will suffice to establish the interstate nexus." Appellant's Opening Brief at 26.

Turning to the language of the statute, §1365(b) refers only to a "consumer product" which must "affect[ ] interstate commerce." "Components" does not appear in the language of § 1365. However, "consumer product" is defined in § 1365(g)(1)(A) to include any "food" as that term is defined in the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 321. That act defines "food" as "(1) articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for *components* of any such arti-

cle." 21 U.S.C. § 321(f) (emphasis added). Thus, the components of Diet Pepsi are included in the definition of "consumer product" in 18 U.S.C. § 1365.

It is clear from the statute that tainting the components of Diet Pepsi is conduct which could constitute a violation of § 1365(b).[10] However, because we conclude that the consumer product *in this case* is the can of Diet Pepsi which was tainted, and not its components, the question we face is whether the jury was properly instructed that the consumer product was the can of Diet Pepsi and did not include the components of that can.

While the components remained separate properties, they could have been tainted and their tainting in that condition could be proven to affect commerce at the time of tainting or thereafter, all within the proper interpretation of § 1365. Under the facts here, however, the untainted components cannot satisfy the requirement that "such consumer product affect[ ] interstate or foreign commerce." Any reference to components in the jury instructions (apart from an instruction that the components in this case could not satisfy the interstate commerce requirement) was therefore erroneous. By informing the jury that the government did not have "to prove that [Levine] knew that the consumer product or its components had previously travelled in interstate commerce" the district court led the jury to believe that the previous movement of the components in interstate commerce alone could satisfy the interstate commerce element. The likelihood of prejudice was especially great in light of the substantial evidence admitted at trial, over objection, regarding the earlier interstate movement of components before any tainting occurred.[11]

10. Common sense dictates that the purpose of including components in the definition of "consumer product" was to ensure that the legislation would reach tampering at all stages of the manufacturing process.

11. Over a defense objection the government was allowed to elicit testimony regarding the interstate nature of the aluminum used to make the can. The defense later requested and received a continuing objection to the relevancy of testimony regarding components. A government witness testified that the Diet Pepsi components came from Texas and Puerto Rico. The government, again over defense objection, was allowed to put in evidence various shipping invoices and bills of lading which indicated the receipt of Diet Pepsi components (*e.g.,* acidulant, salts, aspartame, and flavor) at the Denver Pepsi facility from the facility in Arlington, Texas. Addendum to Appellee's Brief, docs. 16–20 (government exhibits 31–35). Testimony regarding these docu-

During discussions in chambers regarding jury instructions, the defense objected to an instruction that read "it's sufficient if the consumer product or the components previously had traveled in interstate commerce." The district court agreed to strike this instruction on the ground that it incorrectly stated the law. Accordingly, defense counsel then moved to strike the phrase "or its components" from the following instruction:

> The government may meet its burden with respect to this element by proving a connection between interstate commerce and the consumer product in the indictment. It is not necessary for the government to prove that the defendant knew that the consumer product *or its components* had previously travelled in interstate commerce.

Appellant's Opening Brief, App. A at 7 (emphasis added).[12] The district court refused to strike the phrase "or its components," stating "I am going to give each side a fair opportunity here." This refusal to strike the phrase was prejudicial error.

In light of the evidence admitted and stressed concerning the components, and the reference to components in the jury charge, we are convinced that Levine was prejudiced. Under the instruction the jury was free, if it wished, to find that the element of interstate commerce was satisfied by proof of the pre-tainting events, based solely on the components' having earlier moved in interstate commerce, before the existence of the "consumer product" that Levine tainted. Under the proper interpretation of the statute explained earlier, proof beyond a reasonable doubt that the tainted can of Diet Pepsi had an effect on interstate commerce at or after the time when Levine tainted it was required. *See United States v. Linn*, 31 F.3d 987, 990 (10th Cir.1994) (due process requires proof beyond reasonable doubt) (citing *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)). This requirement was not made clear in the instructions. The government in effect asks us to sustain the conviction on the assumption that the jury was properly guided. However, "[a] conviction ought not to rest on an equivocal direction to the jury on a basic issue." *Bollenbach*, 326 U.S. at 613, 66 S.Ct. at 405. Therefore, reversal is required.[13]

### B

The second claim of error in the jury instructions Levine raises was the district court's use of the past tense "affected" rather than the present tense "affects" which appears in § 1365(b). Levine contends that the use of the past tense moved "the critical

ments was introduced by the government over defense objection.

Moreover, in its brief in this appeal, the government stated that it "emphasized this pre-tainting evidence at trial," Appellee's Brief at 19, and noted that "[t]he evidence at trial proved that the Diet Pepsi consumer product affected interstate commerce in many ways. That proof was most pronounced in the evidence of the interstate transportation of the ingredients." Appellee's Brief at 26. It is thus clear that the government relied heavily on the interstate movement of the components, before the tainting occurred, to prove the interstate commerce element.

**12.** We agree that a central point made in this charge was valid. As in *United States v. Feola*, 420 U.S. 671, 676, 684, 95 S.Ct. 1255, 1259–60, 1263–64, 43 L.Ed.2d 541 (1975), we feel the proper interpretations of § 1365(b) do not impose a scienter requirement with respect to the jurisdictional element of having an effect on interstate or foreign commerce. It is enough that the defendant had the intent to cause serious injury to the business of any person by tainting the consumer product—the gist of the substantive offense. The scienter requirement of § 1365(b) does not extend to the jurisdictional interstate commerce element.

Nevertheless, the portion of the charge identifying the components, as well as the tainted consumer product in delimiting the scienter proof required, misled the jury.

**13.** The indictment charges that Levine "knowingly tainted a 12–ounce can of Diet Pepsi, which was a consumer product that affected interstate commerce." Thus, the consumer product identified in the indictment is the individual can of Diet Pepsi Levine tainted. Allowing the jury to consider components also had the effect of amending the indictment. However, a grand jury's "charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215–16, 80 S.Ct. 270, 272, 4 L.Ed.2d 252 (1960). "Any such amendment effected by the court's instructions would constitute plain error and be reversible per se." *United States v. Phillips*, 869 F.2d 1361, 1364 (10th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2074, 104 L.Ed.2d 638 (1989).

inquiry away from whether the tainted item was in or affecting commerce ... towards a more general examination of whether *anything* ever before traveled in commerce, regardless of whether it was still doing so." Appellant's Opening Brief at 28 (emphasis in brief). According to Levine, the proper language would have been "was affecting."

■ The specific instruction in issue was the fourth essential element of the offense: "[t]he consumer product which allegedly was tainted was one that affected interstate commerce." Appellant's Opening Brief, Exhibit A at 5. The defense objected to this instruction and requested the following alternatives: (1) "The consumer product item which was tainted was affecting interstate commerce"; or (2) "At the time of tainting, the consumer product which allegedly was tainted was one that affected interstate commerce." None of these instructions correctly states the law.

The instructions proposed by the defense require the product to be affecting interstate commerce at the time of tainting. This interpretation of § 1365(b) is too narrow. As noted earlier, the consumer product must affect commerce at *or after* the time of tainting. Thus, the defense instructions did not accurately state the law, and the district court properly refused them.[14]

■ Conversely, the district court's instruction was erroneous because it was too broad. The instruction the district court gave—"[t]he consumer product which allegedly was tainted was one that affected interstate commerce"—was misleading because it allowed the jury to find that the interstate commerce element was satisfied by events which occurred *prior* to the tainting. As noted, we hold that pre-tainting events cannot satisfy the interstate commerce requirement of § 1365(b). Because the jury could have convicted Levine by finding that the tainted can of Diet Pepsi had somehow affected interstate commerce due to the prior movement of the can or its components in commerce, the erroneous instruction was not harmless. Therefore, this portion of the charge was also prejudicial error.

## C

Levine claims the district court erred when it failed to instruct that the product must be affecting interstate commerce at the time of tainting. Appellant's Opening Brief at 29–32. As noted above, the product does not have to be affecting interstate commerce at the time of tainting as long as there is a subsequent effect on interstate commerce. The district court did not err in refusing to give this proposed instruction.

## D

Lastly, Levine asserts that even if we determine that none of the three allegedly erroneous instructions entitle her to a new trial, the combination of these allegedly erroneous instructions requires reversal. Appellant's Opening Brief at 32–33. Because we reverse on the grounds stated above, we need not address this claim.

## IV

In sum, we hold that the jury was improperly instructed on the interstate commerce requirement of § 1365(b), as noted above. Because of the improper instructions, Levine's conviction under § 1365(b) cannot stand.

Accordingly, we **REVERSE** the judgment of the district court and **REMAND** the case for a new trial.

---

**14.** The proposed instructions are also inconsistent with Levine's position that the tainted item must affect interstate commerce at *or after* tainting. *See* Appellant's Opening Brief at 14.