**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Bobby Joe JOHNSTON, Defendant–
Appellant.**

No. 93–6287.

United States Court of Appeals,
Tenth Circuit.

Dec. 16, 1994.

William P. Earley, Asst. Federal Public Defender (Susan M. Otto, Federal Public Defender, with him on the brief), Oklahoma City, OK, for defendant-appellant.

Ted A. Richardson, Asst. U.S. Atty. (Vicki Miles–LaGrange, U.S. Atty., with him on the brief), Oklahoma City, OK, for plaintiff-appellee.

Before SEYMOUR, Chief Judge, McKAY, and TACHA, Circuit Judges.

SEYMOUR, Chief. Judge.

Bobby Joe Johnson appeals his conviction by a jury of violating 18 U.S.C. § 1365(b) (1988) by wilfully tampering with a Pepsi–Cola can. He argues that his alleged conduct does not constitute a violation of federal law, and that the trial court erroneously instructed the jury regarding interstate commerce, an essential element of the offense charged. We affirm.

## I.

Mr. Johnson reported to medical personnel that he had taken a drink of Pepsi–Cola from a can and experienced immediate burning in his throat and mouth. He was then transported by ambulance to the hospital, along with the open can of Pepsi–Cola and the remaining five cans of the six pack. After testing the cans in question, the government determined that there was no evidence of tampering and that the caustic substance had to have been added to the can after it had been normally opened. Mr. Johnson was charged with knowingly and wilfully tampering with a consumer product with intent to cause serious injury to the business of Pepsi–Co, Inc., in violation of section 1365(b).

A PepsiCo witness testified at trial that there were devastating, nationwide news reports about Mr. Johnson's incident. In the Oklahoma region alone, PepsiCo sustained a total loss in sales of $495,654 over the two-week period following Mr. Johnson's incident. This witness also testified that on the Monday following the incident, Mr. Johnson's lawyer called and wrote PepsiCo to discuss Mr. Johnson's injuries and a possible resolution. Mr. Johnson rested without presenting evidence.

## II.

■ Mr. Johnson contends that his alleged conduct does not constitute a violation of federal law. Because he does not dispute the factual allegations, the question is one of statutory interpretation which we review *de novo. See FDIC v. Lowery,* 12 F.3d 995, 996 (10th Cir.1993). The statute under which Mr. Johnson was indicted and convicted states that:

> (b) Whoever, with intent to cause serious injury to the business of any person, taints any consumer product or renders materially false or misleading the labeling of, or container for, a consumer product, if such consumer product affects interstate or foreign commerce, shall be fined not more than $10,000 or imprisoned not more than three years, or both.

18 U.S.C. § 1365(b). Mr. Johnson argues that his conduct is not covered by this statute

because the phrase "affects interstate commerce" requires reintroduction of the tainted product into the stream of commerce. He also argues that the facts, accepted as true, fail to establish that he intended "serious injury" to PepsiCo's business.

Mr. Johnston contends that the "affects interstate commerce" requirement must encompass the reintroduction of the product into the stream of commerce in order to insure that the requisite nexus is present between federal jurisdiction and the prohibited conduct. He points to the legislative history of the statute, which sets out Congress' concern that federal jurisdiction be limited to crimes in which the federal interest is clear, and which states that federal jurisdiction should therefore end when the requisite effect on interstate commerce ends. Mr. Johnston asserts that once the consumer product here was withdrawn from the stream of interstate commerce by his purchase of it, the product could only thereafter have the required effect if it were returned to interstate commerce. We disagree.

We have recently addressed the "affects interstate commerce" requirement of section 1365(b) under closely analogous circumstances. *See United States v. Levine,* 41 F.3d 607 (10th Cir.1994). There, as here, the defendant tainted a can of soda after removing it from the shelf of a retail store and then publicized the story in the news media. In *Levine,* the defendant made essentially the same argument Mr. Johnston makes here, contending that her conduct did not violate section 1365(b) because the can did not travel in interstate commerce after it was tainted. In response, we undertook a thorough examination of the legislative history and concluded "that the requisite effect on interstate commerce must occur at or after tainting." *Id.* at 614. We further held that this effect may be established in three ways:

> (1) ... the product was in interstate commerce at the time of tainting; we are persuaded that the canned "consumer product" is in interstate commerce during its entire commercial journey if part of that journey involves movement across state lines; (2) ... the product was not in interstate commerce at the time of taint-

ing, [but] after tainting it was returned to interstate commerce; we are persuaded that if a "consumer product" is taken off the shelf, tainted, and then returned to the shelf, it would still be in interstate commerce when the tainting occurred; or (3) . . . there was an actual impact on interstate commerce as a result of the tainting of the product.

*Id.* at 614–15.

■ Here, as in *Levine,* although the can was not in interstate commerce when it was tainted and was not returned to interstate commerce after tainting, the evidence is sufficient to establish that the tainting resulted in an actual impact on interstate commerce. The plant manager for the Kansas PepsiCo facility that produced the can Mr. Johnston tainted testified that Pepsi had received unfavorable publicity in the news media due to Mr. Johnston's actions and that Pepsi had suffered a decline in sales in the Kansas market of 25,000 cases from the previous year during the relevant period. The operations manager for PepsiCo in Oklahoma City testified that that area lost over $95,200 in sales due to Mr. Johnston's conduct. PepsiCo's vice president of public affairs testified that the company's total sales loss in the region over a two week period was $495,654. This evidence establishes an actual impact on interstate commerce as a result of the tainting under our holding in *Levine.*

■ Mr. Johnston's also argues that the government failed to allege facts sufficient to establish that he intended to seriously injure PepsiCo. Specifically, he argues that the intended injury was not serious. He points to the fact that he asked the hospital not to give any information to the press, the absence of a specific demand on PepsiCo, and "the comparatively slight harm flowing from the incident" as factors mitigating against the injury being serious. Brief of Aplt. at 14.

The district court correctly decided that the government's evidence of Mr. Johnson's intent to cause PepsiCo serious injury was sufficient for the question to be decided by the jury. The fact that Mr. Johnson asked the hospital not to give any information to the press is not determinative of the question. The jury could infer that Mr. Johnson did not want the press notified because he wanted to use the threat of publicity to increase a monetary award from PepsiCo. In addition, Mr. Johnson's failure to actually make a specific demand upon PepsiCo for damages does not necessarily mitigate against the seriousness of the intended injury. The statute requires only that the defendant *intend* to cause serious injury.

There is ample evidence in the record for a jury to conclude that Mr. Johnson intended to demand a large sum of money from PepsiCo, even if he actually had not done so. The paramedics who responded to Mr. Johnson's 911 call testified that when they asked him whether he drank only the Pepsi–Cola, he answered, "Yes, somebody is going [to] pay for this." Rec., vol. II, at 56. He also told the emergency room nurse to save the can of Pepsi–Cola because his lawyer would be needing it. Rec., vol. III, at 158. In addition, Mr. Johnson's attorney called and wrote PepsiCo's general offices in New York on the first business day after the incident to discuss a "resolution." *Id.* at 250–52.

■ We are not persuaded by Mr. Johnson's argument that the harm he actually caused PepsiCo was relatively slight and shows the intended injury was not serious. Proof of actual loss is not required in a crime involving only intent to injure. *Cf. United State v. Bowen,* 946 F.2d 734, 737 (10th Cir. 1991) (proof of actual loss not essential to show misapplication of bank funds with an intent to injure or defraud the bank). Evidence of actual loss may be relevant to whether the defendant had the requisite intent, *id.,* but it is not determinative of whether a serious injury to business was intended. As such, the issue is not one that should be decided as a matter of law, and it was properly given to the jury to decide.

PepsiCo, a corporation with sales of nearly $22 billion dollars, testified that it sustained monetary losses of nearly $500,000 and suffered extensive negative publicity due to the incident. Although the monetary loss was not a large percentage of PepsiCo's total sales, the jury considered this loss, along with the negative publicity, and the evidence of Mr. Johnson's intent to extort money from

the company, and reasonably found he intended to seriously injure PepsiCo.

### III.

Mr. Johnston also contends the trial court erroneously instructed the jury on the definition of "interstate commerce." He asserts that the definition of interstate commerce should have included a statement that "the government must prove beyond a reasonable doubt the tainted product was returned to the field of interstate or foreign commerce." Brief of Aplt. at 15. Under our holding in *Levine,* however, the tainted product need not be returned to the stream of commerce if the tainting has an actual impact on interstate commerce. Accordingly this argument is without merit.

The conviction is AFFIRMED.