# United States Court of Appeals
## For the First Circuit

No. 18-2078

UNITED STATES OF AMERICA,

Appellee,

v.

JOSÉ PADILLA-GALARZA,
a/k/a Joey,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

Rafael F. Castro Lang for appellant.
Alexander L. Alum, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, were on brief, for appellee.

March 5, 2021

**SELYA**, <u>Circuit Judge</u>. Defendant-appellant José Padilla-Galarza, having created a ruckus before a jury empaneled to hear criminal charges against him for armed bank robbery and related crimes, tries to turn the tables. He asserts that his outburst should have prompted the district court to grant his motion for a mistrial. For good measure, he spells out an alphabet of putative errors, ranging from allegations of arbitrary authorization of protective orders to allegations that the district court failed to zap excesses of prosecutorial zeal. Concluding, as we do, that the appellant's claims lack force, we affirm the judgment below.

## I

We start by briefly rehearsing the background of the case, drawing the facts from a balanced assessment of the record. To the extent that the government's evidence about the scheme and the appellant's involvement in it differs from the appellant's own testimony, we generally credit the government's evidence (as did the jury). <u>Cf.</u> <u>United States</u> v. <u>Maraj</u>, 947 F.2d 520, 522 (1st Cir. 1991) (providing that when reviewing a motion for judgment of acquittal, all facts must be taken in the light most favorable to the government). We then sketch the travel of the case.

## A

On November 29, 2014, an armed heist took place at a Banco Popular branch in Bayamón, Puerto Rico. Three individuals — Johan Dávila-Rivera (Dávila), Jorge Camacho-Gordils (Camacho),

- 2 -

and Samuel Figueroa — entered the bank disguised as construction workers and wearing helmets, black gloves, and fake facial hair. Once inside, the trio brandished firearms, ordered everyone to the floor, and demanded money from the bank's vault. A teller complied, filling bags with what was later determined to be a total of $64,633.13. But this was not all: the teller also inserted electronic dye-pack devices designed to spew dye, smoke, and other substances when removed from the premises.

Bags of money in hand, the three robbers fled. At that point, their plan promptly began to unravel. Dávila was forced to discard some of the bags when they began to smoke. With what loot remained, the robbers sped off in a getaway car (a green Toyota Tercel). Soon thereafter, they switched cars, abandoned the Toyota, and scattered (with Figueroa retaining most of what money remained).

Subsequent investigation revealed that Dávila, Camacho, and Figueroa did not act alone in carrying out the robbery: the appellant played a leading role both in recruiting a crew and in developing and executing the scheme. Among other things, the evidence supported findings that he did the planning, delivered the disguises used in the robbery, and laid out the approach to the bank.

When the authorities dug deeper, they learned that the appellant's scheme extended beyond the bank robbery itself. As

part of the plot, two other coconspirators — Miguel Torres-Santiago (Torres) and Jomar Hernández-Román (Hernández) — had been slated to rob the nearby Abraham Rosa Credit Union earlier the same day. The appellant enlisted their participation and met with them several times at Hernández's residence. At the second such meeting, the appellant mentioned that he intended to have fake bombs planted as a distraction.

The appellant set both phases of the scheme in motion on the morning of November 29. At approximately 8:00 a.m., Torres and Hernández proceeded to the credit union to carry out that aspect of the plot. The appellant had instructed Torres to enter the credit union and pretend to cash a check, at which point he would be "taken hostage" by Figueroa. Hernández was to serve as the lookout.

What happened next was reminiscent of the legendary gang that couldn't shoot straight. See Jimmy Breslin, The Gang That Couldn't Shoot Straight (1969). Torres entered the credit union but Figueroa never appeared. Consequently, Torres retreated in confusion and the holdup at the credit union never materialized.

Meanwhile, acting on the appellant's instructions, Camacho and Figueroa planted two bogus bombs furnished by the appellant — one near the ATM outside Bayamón City Hall and the other outside a Banco Popular branch in Loma Verde. Although the record is nebulous as to when and how the bogus bombs were first

spotted, the local police force soon responded to reports about suspicious objects. The officers deployed specialized personnel to defuse any discovered explosives.

With the distraction operation underway, the robbers proceeded to enter the Banco Popular branch in Bayamón. We already have chronicled what transpired inside the bank. See text supra.

Both local police and agents of the Federal Bureau of Investigation (FBI) responded to the scene of this robbery. It did not take long for them to discover the abandoned Toyota a quarter mile from the bank, dye-stained money littering the interior. A discarded construction helmet and black gloves were found in a nearby trash can. The Toyota yielded another important clue: a receipt, found in the back seat, documented a transaction that had taken place four days earlier at a Party City store in San Patricio. Surveillance footage obtained from the store showed the appellant, Hernández, and a third man purchasing fake facial hair products that matched those used by the robbers.

When the FBI detained Hernández for questioning in December of 2014, he made a number of incriminating statements during a six-hour interview. He admitted, for example, that he had participated in surveilling the bank, that he had accompanied the appellant both to Party City and to Home Depot to purchase accouterments similar to those used in effectuating the robbers'

disguises, and that he had transported a shotgun to the appellant's home in the Barrio Macún neighborhood for use in the heist.

On January 9, 2015, the FBI obtained both an arrest warrant for the appellant and a search warrant for his home. The ensuing search turned up (as relevant here) ammunition rounds, fake facial hair, and black gloves (still bearing manufacturer's tags) identical to those discovered near the abandoned Toyota.

Following the search, the appellant submitted to interviews. He described himself as a former police officer who had transitioned into construction work. He admitted that he previously had owned the Toyota used in the escape but claimed to have sold it on the morning of the robbery. He also admitted to making purchases at Party City and Home Depot during the week before the robbery, but he claimed that those purchases were made for innocent purposes.

**B**

The appellant was charged, alongside Hernández, Figueroa, Dávila, Camacho, and Torres, in a five-count indictment.[1] The charges included conspiracy to commit bank robbery, see 18

---

[1] On the same day, the appellant was separately indicted for possession of ammunition as a convicted felon and possession of marijuana with intent to distribute (Criminal Case No. 15-78). These charges arose out of the discovery of contraband during the execution of the search warrant at the appellant's home. This second indictment, which was tried before a different district judge, is not before us.

U.S.C. § 371; armed bank robbery, see id. § 2113(a); conspiracy to commit Hobbs Act robbery, see id. § 1951(a); Hobbs Act robbery, see id. § 1951(a); and use and carriage of firearms during and in relation to crimes of violence, see id. § 924(c)(1)(A)(ii).

Four of the defendants eventually entered guilty pleas and two of them (Dávila and Torres) agreed to become cooperating witnesses for the government. The appellant and Hernández proceeded to stand trial.

The impending trial proved fertile terrain for extensive pretrial motion practice. The district court dealt with questions concerning subjects as diverse as severance, protective orders, and the sometimes stormy relationship between the appellant and his trial counsel (Melanie Carrillo). The trial, which lasted for 14 days, was tumultuous. The appellant appeared in court on the first day, but his appearance was short-lived. He became increasingly agitated and loudly declared that the trial should not proceed. When his disruptive behavior escalated, the court had him escorted from the courtroom, and he listened to and watched most of the trial virtually from a remote cellblock. The court appointed a second lawyer to be at the appellant's side in the cellblock during trial proceedings.

On the ninth day of trial, the appellant was allowed into the courtroom after having assured the court that he would conduct himself appropriately. That assurance proved hollow: once

in the courtroom, he loudly disparaged Carrillo and hurled accusations at the district court in front of the jury. The court again ordered the appellant removed from the courtroom and denied his ensuing motion for a mistrial.

At the close of the government's case, the appellant moved for judgment of acquittal. See Fed. R. Crim. P. 29(a). The district court denied this motion but permitted the government to reopen its case in chief to clarify certain jurisdictional elements of the crimes (not now in issue). The jury ultimately found both the appellant and Hernández guilty on all five counts. The district court subsequently sentenced the appellant to an aggregate 228-month term of immurement (the components of which are delineated in Part X, infra). In addition, the court ordered the appellant to make restitution to Banco Popular in the sum of $64,000.

This timely appeal ensued. Hernández also appealed, but his appeal has been separately adjudicated. See United States v. Hernández-Román, 981 F.3d 138 (1st Cir. 2020). In the pages that follow, we set forth the standards of review that variously apply to the appellant's manifold claims of error. We then discuss these claims in roughly the order in which they surfaced below. We treat them all as either preserved or deemed to be preserved, unless otherwise indicated. Other claims of error, as to which further

discussion would be pleonastic, are patently meritless, insufficiently developed, or both.

## II

The appellant's claims of error trigger familiar standards of review. To begin, we review preserved claims of legal error (that is, claims that turn on pure questions of law) de novo. See United States v. Simpkins, 978 F.3d 1, 6 (1st Cir. 2020); United States v. Pinkham, 896 F.3d 133, 137 (1st Cir. 2018). In contrast, we evaluate the district court's factfinding only for clear error. See United States v. Tanguay, 811 F.3d 78, 81 (1st Cir. 2016); United States v. Matos, 328 F.3d 34, 38 (1st Cir. 2003). On clear error review, we will "not . . . upset findings of fact or conclusions drawn therefrom unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made." Cumpiano v. Banco Santander P.R., 902 F.2d 148, 152 (1st Cir. 1990).

When a defendant interposes a contemporaneous objection at trial — challenging, say, an evidentiary ruling or the phrasing of a jury instruction — we ordinarily review the district court's actions for abuse of discretion. See, e.g., United States v. Griffin, 818 F.2d 97, 99-100 (1st Cir. 1987) (describing rationale for requirement that litigants "alert the district judge to error-in-the-making when and as the occasion arises"). The abuse of discretion standard is not monolithic but, rather, encompasses "de

novo review of abstract questions of law, clear error review of findings of fact, and deferential review of judgment calls." United States v. Lewis, 517 F.3d 20, 24 (1st Cir. 2008) (footnote omitted). The variegated nature of this standard is consistent with a recognition that a district court exercises considerable latitude with respect to many aspects of a trial. See Indep. Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir. 1988).

Different rules obtain when a party remains silent at trial only to surface a claim of error for the first time on appeal. In such an event, appellate review is ordinarily limited to plain error. See United States v. Rodriguez, 919 F.3d 629, 634 (1st Cir. 2019). The proponent of plain error must carry the devoir of persuasion as to each of four showings: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001). In practice, the plain error doctrine allows an appellate court to correct egregious missteps but not the "ordinary backfires" that are apt to occur during any trial. Griffin, 818 F.2d at 100.

Of course, a party sometimes may identify an issue at trial but then "relinquish[] or abandon[]" any objection to it.

United States v. Rodriguez, 311 F.3d 435, 437 (1st Cir. 2002). In such circumstances, we generally consider the argument waived. See id. Once waived, an argument is dead and cannot be resuscitated on appeal. See United States v. Coleman, 884 F.3d 67, 71 (1st Cir. 2018).

These several standards variously inform our subsequent discussion of the appellant's claims.

**III**

Our appraisal of the appellant's asseverational array begins with his claim that the district court abused its discretion by denying his pretrial motion to sever his case from that of his codefendant (Hernández). See Fed. R. Crim. P. 14(a) ("If the joinder of offenses or defendants . . . appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Where, as here, defendants are charged with the same crimes in the same indictment, joinder is prima facie appropriate and severance ordinarily will not lie. See Fed. R. Crim. P. 8(b); United States v. Houle, 237 F.3d 71, 75-76 (1st Cir. 2001). But this general rule — like most general rules — admits of exceptions.

The appellant asserts that such an exception applies in this case. The impetus for his severance motion draws its essence from Hernández's December 2014 interviews with the FBI. During

- 11 -

those sessions, Hernández made statements that inculpated both himself and the appellant in the charged crimes. Although there is no evidence that the appellant set foot in either the Banco Popular branch bank or the credit union, Hernández's narrative identified him as having been involved in virtually every preparatory step.

Aware of Hernández's confession, the appellant filed a pretrial motion for severance, arguing that Hernández's statements, if introduced into evidence at a joint trial, would violate his Sixth Amendment rights. See Bruton v. United States, 391 U.S. 123, 137 (1968) (holding that a defendant's Sixth Amendment right to confront his accusers through cross-examination is abridged when the incriminating statements of a nontestifying codefendant are admitted at trial). He also argued that "where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial," a court cannot employ "limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination."

Faced with the appellant's motion, both the government and the district court recognized that the Bruton rule does not present courts with an all-or-nothing proposition. The case law makes manifest that redaction is an acceptable means of curing a potential Bruton violation. See Richardson v. Marsh, 481 U.S.

200, 209 (1987). Even so, prophylactic revisions must be carefully tailored in order to satisfy the Bruton standard. Put another way, the law recognizes that a clumsy or incomplete modification may still point unerringly to a nontestifying defendant. See Gray v. Maryland, 523 U.S. 185, 188 (1998). On appeal, we must assay "the efficacy of redaction on a case-by-case basis, paying careful attention to both a statement's text and the context in which it is offered." Foxworth v. St. Amand, 570 F.3d 414, 433 (1st Cir. 2009).

In the case at hand, the government responded to the appellant's severance motion by advising the district court that it had a plan to avoid potential Bruton pitfalls. It would elicit evidence of Hernández's confession only through the testimony of a law enforcement officer rather than by proffering, say, a tape recording or written transcript. Relatedly, it would ensure that the testifying officer substituted generic phrases (e.g., "another person") in lieu of Hernández's specific references to the appellant. Based on these representations — and with the acquiescence of the appellant's trial counsel — the district court denied the severance motion.

On the first day of trial, the parties and the district court again discussed Hernández's statements. The government acknowledged its awareness of the potential Bruton issue and assured the court that the proposed agent-witness "ha[d] been

- 13 -

instructed" in line with the earlier agreement. The court interrupted, noting that the agreement was that "[a]ny statement made by a co-defendant will not be stated as to him." The appellant's trial counsel responded in a single word: "[e]xactly."

During the trial, the government called the FBI agent to testify about Hernández's statements. At that juncture, the appellant's trial counsel questioned whether, even with the use of generic references that "sanitized" the agent's testimony to the extent the government had represented, the jury nonetheless might identify the appellant as one of the persons who visited Home Depot and Party City. The prosecutor responded that the government would take care to "lead [the agent] through these questions and we'll avoid the Bruton issue." Following this assurance, the appellant's counsel did not press her objection. The district court apparently deemed it withdrawn,[2] see United States v. Rogers, 918 F.2d 207, 212 (D.C. Cir. 1990) (describing objecting party's burden "to make clear to the district court that he is pressing his point" (quoting Krause v. Chartier, 406 F.2d 898, 901 (1st Cir. 1968))); cf. United States v. Potts, 644 F.3d 233, 235-36 (5th Cir. 2011) (deeming claim unpreserved when objecting party failed to "reassert his

_____

[2] The district court made no formal ruling but merely told the parties to "[g]o ahead." On appeal, the appellant makes no mention of this colloquy; but in his reply brief, he acknowledges that his trial "counsel did not object to the Government's proposed solution" to the potential Bruton issue.

- 14 -

objection" subsequent to proposed curative action), and the prosecutor conducted the remainder of the examination in accordance with her assurance.

Against this backdrop, the appellant mounts a claim that the district court's decision to allow the agent's testimony constituted an abuse of discretion. The lynchpin of his argument is that the government's proposed redaction insufficiently neutralized the incriminating impact of Hernández's statements and that, therefore, the district court should have severed the trials of the two defendants.

In examining this claim of error, Bruton and its progeny would normally supply the guardrails that we must honor. Here, however, there is a bend in the road: although appellate review of a Bruton challenge is ordinarily de novo, see United States v. Vega Molina, 407 F.3d 511, 519 (1st Cir. 2005), the record indicates that the appellant waived this line of argument below. See United States v. Olano, 507 U.S. 725, 733 (1993) ("[W]aiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938))). We explain briefly.

The Bruton issue first surfaced at a pretrial conference, prompted by the appellant's severance motion. At this conference, the prosecutor spelled out the government's planned procedure for handling Hernández's confession. The appellant's

trial counsel assented to the prosecutor's proposal, stating explicitly that the appellant "ha[d] no objection" to going forward in the manner described. And on the first day of trial, counsel verified that the parties had agreed to proceed in this manner.

Counsel's statements satisfy the accepted definition of waiver. She expressly acknowledged the appellant's potential Bruton claim and, in response to the prosecutor's representations, deliberately relinquished this appreciated right. So viewed, the waiver doctrine "fits this case like a glove." United States v. Orsini, 907 F.3d 115, 120 (1st Cir. 2018).

The appellant has a fallback position. He contends for the first time on appeal that the presentation of Hernández's redacted confession, when viewed alongside certain other trial evidence, allowed the jury to infer that the appellant was the unnamed individual mentioned in the agent's redacted account of Hernández's statement. In particular, the appellant emphasizes the prosecutor's statement during closing argument that the appellant lived in Barrio Macún. This links up, the appellant suggests, with a statement in Hernández's confession to the effect that he (Hernández) delivered a shotgun to a person residing in Barrio Macún for use in the Banco Popular robbery.

Even apart from the fact of the appellant's waiver, this is whistling past the graveyard. The Supreme Court has held that an out-of-court confession of a non-testifying defendant that only

- 16 -

"inferential[ly] incriminat[es]" a codefendant who is on trial through deductive links to other evidence does not animate that codefendant's Sixth Amendment concerns in the same manner as a head-on accusation.  Richardson, 481 U.S. at 208.  That is the situation here, and we discern no error — plain or otherwise — in connection with this unpreserved claim of error.

**IV**

Next, the appellant contends that the district court abused its discretion in granting a protective order relating to certain discovery materials.  Some stage-setting is useful.

Prior to trial, the government fulfilled its obligation under the Jencks Act to disclose certain evidentiary materials to the defense.  See 18 U.S.C. § 3500(b); see also United States v. Sepúlveda-Hernández, 752 F.3d 22, 32 (1st Cir. 2014) (explaining that "[t]he Jencks Act obliges the government . . . to proffer upon a defendant's timely request any statement of [a particular] witness in its possession, whether or not exculpatory, that relates to the subject matter of the witness's testimony").  These materials included transcripts of grand jury testimony given by two of the government's cooperating witnesses (Dávila and Torres).  Citing security concerns,[3] the government asked the district court

---

[3] The government's initial motion for a protective order cited the appellant's potential exposure to "lengthy periods of incarceration" as a likely incentive for him to "resort to extreme measures."  When the appellant later questioned the need for the

for a protective order barring defense counsel from leaving copies of the cooperators' statements with the appellant (although counsel would remain at liberty to review the contents of those statements with him). The district court granted the government's motion and rejected the appellant's subsequent efforts to vacate or modify the protective order — efforts that included attacks on the protective order both at the beginning of the trial and in a post-conviction motion.

The appellant argues that the protective order was "[un]substantiated by fact" and issued "blindly." Even though the protective order allowed the appellant's counsel to review the Jencks Act materials with him, the appellant brands this accommodation as ineffectual in view of the dysfunctional relationship between the two. Thus, the appellant concludes, the terms of the order deprived him of his Sixth Amendment right to assist meaningfully in his own defense. See McKaskle v. Wiggins, 465 U.S. 168, 174 (1984) ("The [Sixth Amendment] . . . implies a right in the defendant to conduct his own defense, with assistance at what, after all, is his, not counsel's trial.");

_____

order, the government explained that two prospective witnesses against the appellant had recently become unavailable. One was in a vegetative state because he had fallen (or been pushed) off a jail roof; the other had declined to afford any cooperation after the murder of his wife. Despite the lack of any evidence that the appellant was directly involved in either incident, the government argued that this pattern of events justified incremental security measures.

LaChappelle v. Moran, 699 F.2d 560, 564 (1st Cir. 1983) ("A central principle derived from the confrontation clause [of the Sixth Amendment] is the defendant's right to participate in his own defense.").

The Criminal Rules require that a movant demonstrate "good cause" for a protective order. Fed. R. Crim. P. 16(d)(1); see United States v. Wecht, 484 F.3d 194, 211 (3d Cir. 2007). In turn, "[a] finding of good cause must be based on a particular factual demonstration of potential harm, not on conclusory statements." Anderson v. Cryovac, Inc., 805 F.2d 1, 7 (1st Cir. 1986). We review the district court's decision to grant a protective order for abuse of discretion. See United States v. Rosario-Peralta, 175 F.3d 48, 55 (1st Cir. 1999). In conducting this tamisage, we remain mindful that district courts possess considerable latitude both in determining whether to issue protective orders and in fashioning their terms. See Danny B. ex rel. Elliott v. Raimondo, 784 F.3d 825, 834 (1st Cir. 2015). We will reverse the grant of a protective order only "when it is sufficiently prejudicial and based upon an incorrect legal standard or a misapplication of law to fact." Id.

Applying these constructs, we conclude that the district court's protective order passes muster. At the first step, the appellant acknowledges that witness protection is a proper rationale for a protective order. See Fed. R. Crim. P. 16(d)(1)

advisory committee's note to 1966 amendment (confirming that "the safety of witnesses" and "witness intimidation" are proper bases for protective order). Although there is no direct evidence that the appellant was responsible for the sudden unavailability of two prospective witnesses against him, the pattern of harm described by the government in chambers was both sufficiently specific and sufficiently worrisome to ground the precautionary measures. See, e.g., United States v. Ramos-Cruz, 667 F.3d 487, 501 (4th Cir. 2012) (deeming heightened threat "sufficient[ly]" specific to sustain protective order, allowing witnesses to testify under pseudonyms, even though defendant was "not himself accused of threatening [] witnesses"); United States v. Celis, 608 F.3d 818, 832 (D.C. Cir. 2010) (affirming protective order despite lack of showing that any appellant "had personally threatened any government witness"). Thus, the district court did not abuse its discretion in concluding that the government had shown good cause for the issuance of the protective order.

To cinch the matter, there is no reason to believe that the appellant suffered any cognizable prejudice due to the protective order. The appellant was not entitled to receive Jencks Act materials as to a particular witness until that witness had testified on direct examination. See Fed. R. Crim. P. 26.2(a); see also United States v. Jones, 612 F.2d 453, 455 (9th Cir. 1979) ("Appellant's reliance on the Jencks Act as a pre-trial discovery

tool is completely misplaced. . . . [T]he Act specifically provides that no statement of a government witness is discoverable until the witness has testified on direct examination."). Dávila testified on the sixth day of trial and Torres testified on the ninth day. Yet, the government delivered the Jencks Act materials relative to both cooperating witnesses to defense counsel several days before trial commenced. This extra time offset (at least to a substantial extent) the unavailability of the materials in the defendant's cell. See, e.g., United States v. Dukes, 758 F.3d 932, 938 n.4 (8th Cir. 2014) (rejecting defendant's claimed entitlement to extra time for personal review of Jencks Act materials when materials had been supplied ahead of jury selection); United States v. Nicolapolous, 30 F.3d 381, 383-84 (2d Cir. 1994) (finding no prejudice resulted from defendants' "lack of unconditional access" to Jencks Act materials). And the record reflects that the appellant took due advantage of this opportunity to preview the Jencks Act materials: he and his lawyer reviewed at least half of the materials before a jury was even empaneled.

Nor do we think that this conclusion is undermined by the appellant's claim that he had a dysfunctional relationship with his trial counsel. The claim of a dysfunctional relationship was made below in connection with trial counsel's pretrial motion to withdraw, and the district court — after a hearing in which the appellant himself participated — denied the motion. The appellant

has not appealed from that ruling, and there is no basis for us to second-guess the district court's on-the-spot determination that the relationship between the appellant and his trial counsel was functional. See United States v. Jones, 778 F.3d 375, 388 (1st Cir. 2015).

No more need be said. Striking a balance between a defendant's rights and the need to protect witnesses must be left, in the first instance, to the sound judgment of the district court. See, e.g., United States v. El-Mezain, 664 F.3d 467, 492-93 (5th Cir. 2011). From what we can tell, the court below held that delicate balance steady and true.

On this record, we are satisfied that the court did not abuse its discretion either in issuing the protective order or in determining that the appellant had an adequate opportunity to familiarize himself with the Jencks Act materials. See United States v. Arboleda, 929 F.2d 858, 863-64 (1st Cir. 1991).

The appellant's invocation of the Sixth Amendment does not advance his cause. He contends that the protective order deprived him of the opportunity to assist in his own defense because he could neither study the Jencks Act materials ahead of trial nor adequately confer with his lawyer during the trial itself. This contention, though, comprises more cry than wool. The appellant had no pretrial right to the Jencks Act materials, and any limitations on his ability to consult with trial counsel

concerning those materials were the direct result of his own intentionally disruptive behavior (which caused him to be excluded from the courtroom for most of the trial).[4] On these facts, we discern no Sixth Amendment violation. See United States v. Cordova, 806 F.3d 1085, 1090-91 (D.C. Cir. 2015); United States v. Rivera, 153 F. App'x 758, 760 (2d Cir. 2005) (finding no Sixth Amendment infringement by a protective order preventing defendant from retaining Jencks Act materials at his detention facility).

## V

Relatedly, the appellant argues that the district court abused its discretion by declining to order the government to produce notes supposedly taken by law enforcement agents who interviewed a cooperating witness (Dávila). This argument runs headlong into a threshold obstacle: it is luminously clear that the existence of Jencks Act materials is an implicit precondition to the government's obligation to produce those materials. See United States v. Amaya-Manzanares, 377 F.3d 39, 42-43 (1st Cir. 2004); United States v. Nickell, 552 F.2d 684, 689 (6th Cir. 1977).

---

[4] We hasten to add that even though the appellant was confined to the cellblock for most of the trial, the district court made certain that he had an appointed lawyer by his side. This second lawyer's duties included answering the appellant's questions and conveying "idea[s]" back to the courtroom. There is no reason why this lawyer could not have reviewed Jencks Act materials with the appellant during the trial.

In this case, the appellant has not shown that any such notes ever existed.

The relevant facts are uncomplicated. The appellant's claim has its origins in his attorney's cross-examination of Dávila. One line of questioning dealt with how many times Dávila had been interviewed by representatives of law enforcement and at which meetings notes were taken. From Dávila's replies, the appellant's attorney seemingly came up with a hunch that the government possessed agent notes, comprising Jencks Act materials, that it had failed to disclose. See United States v. Neal, 36 F.3d 1190, 1196-97 (1st Cir. 1999). The government repeatedly denied the existence of any such notes. Lacking a tenable foundation for a conclusion that any such notes had been prepared, the district court refused to order their production.

We discern no abuse of the district court's discretion. Where, as here, a Jencks Act claim surfaces, the district court must "conduct an independent investigation" into the discoverability of the disputed materials. United States v. Landrón-Class, 696 F.3d 62, 73 (1st Cir. 2012) (quoting United States v. Gonzalez-Melendez, 570 F.3d 1, 3 (1st Cir. 2009) (per curiam)). The court below satisfied this obligation by eliciting testimony from Agent Tews (one of the agents present at Dávila's interviews) about the extent of any notetaking activity. The court found credible the agent's testimony that no notes had been taken.

This inquiry was an appropriate way in which to resolve the dispute over the existence vel non of the notes,[5] see United States v. Gonzalez-Melendez, 594 F.3d 28, 35-36 (1st Cir. 2010), and the court's finding that no notes existed was not clearly erroneous. Indeed, the court spent appreciable time attempting to help Dávila parse the relevant distinctions between her initial interviews by law enforcement personnel and her subsequent trial-preparation sessions as a cooperating witness.

That ends this aspect of the matter. Although the Jencks Act imposes a solemn obligation on the government in a criminal case, the government cannot be expected to produce that which has never existed. The appellant's claim of error therefore fails.

**VI**

This brings us to the appellant's mid-trial outburst. As previously explained, the appellant observed most of the trial virtually from his cellblock[6] but the court gave in to his entreaties on the ninth day of trial and allowed him to come to the courtroom. This concession was premised on the appellant's assurance that he would abide by the usual rules of courtroom

---

[5] The prosecutor contemporaneously argued that Dávila's inconsistencies were attributable to the combination of a language barrier and confusion over which interviews the cross-examiner was targeting.

[6] The appellant does not advance any claim of error relating to the district court's original decision to exclude him from the courtroom. We therefore omit any more elaborate discussion of the circumstances undergirding that decision.

decorum. That assurance proved to be mere window dressing: once in the courtroom, the appellant launched into a voluble tirade in front of the jury. The record does not precisely capture the appellant's comments, which were delivered in Spanish. However, the appellant's counsel subsequently described the essence of the outburst in the following terms:

> [W]hat [the appellant] said is that the judge forced him to go to trial . . . [and he] basically said I forced him. That I was lazy, that I was not defending him as I was supposed to, and that I was not doing my job. And, basically, everyone was against him.

The district court endorsed this summary, and we — like the parties — treat it as a fair representation of what the appellant actually said.

In this venue, the appellant characterizes his pent-up frustration with his trial counsel as the trigger for his outburst. Building on that foundation, he argues that the district court abused its discretion by denying his ensuing mistrial motion. In his estimation, witnessing the scene necessarily prejudiced the jury against him and — to make a bad situation worse — his comments may have been construed as an admission of guilt.

Appellate review of the denial of a mistrial motion is for abuse of discretion. See United States v. Lee, 317 F.3d 26, 34 (1st Cir. 2003). This is a deferential standard: "[o]nly in rare instances will we . . . substitute our judgment for the trial

- 26 -

court's first-hand determination that the interests of justice could be served without aborting a trial already in progress." United States v. Rodríguez-Vélez, 597 F.3d 32, 43 (1st Cir. 2010). In this instance, deference is especially appropriate because the appellant's mistrial motion is premised on his own conduct, witnessed at firsthand by the district court. The court, therefore, had a unique opportunity to see and hear the outburst and to gauge its effects on the jury in real time.

Here, moreover, the genesis of the mistrial motion must be factored into the mix. We previously have considered — and decisively rejected — the argument that a defendant can force a mistrial in a criminal case by the simple expedient of behaving badly before the jury. See id. (explaining that "[w]hen a defendant has willfully disrupted the proceedings, a trial court ordinarily acts within its discretion in refusing to grant a mistrial by reason of that disruption"). To rule otherwise would create a "perverse incentive[]" for a defendant to throw any semblance of decorum to the winds. Id.; see United States v. McCormac, 309 F.3d 623, 626 (9th Cir. 2002).

The appellant struggles to put his outburst in a different light. He tries to distinguish Rodríguez-Vélez and similar cases on the ground that those cases — unlike this case — involved only "comments [which] themselves did not impart information prejudicial to the defense." He argues that, by

- 27 -

contrast, his comments can reasonably be construed as an admission of guilt (an argument to which we shortly shall return).

The distinction that the appellant labors to draw is one of degree, not of kind. Whatever the content of a defendant's comments made in the course of a courtroom outburst, the same principles must guide an appellate court's appraisal of whether the district court abused its discretion in denying an ensuing mistrial motion. See United States v. Harris, 2 F.3d 1452, 1456 (7th Cir. 1993); United States v. West, 877 F.2d 281, 288 (4th Cir. 1989).

Of course, abuse-of-discretion review does not denote that a district court is free to turn a blind eye and a deaf ear to the effect of a defendant's antics. In the wake of such an outburst, a trial court is obliged to take reasonable steps to mitigate "any untoward effects that the outburst might have on the jury." Rodríguez-Vélez, 597 F.3d at 43. Sensitive to this obligation, the court below immediately gave a prophylactic instruction:

> [N]othing stated by Mr. José Padilla is to be taken by you as evidence in the case, nor can you use his expressions, that is, the conduct that you saw. That is not evidence in this case . . . I address it standing up because I want you to take that instruction that you just heard seriously, as important as any other instruction that I may provide, have provided, or will provide.

This instruction was well-phrased and delivered in a timely manner. As with all jury instructions, we must presume — in the absence of any evidence to the contrary — that the jurors heeded it.  See Richardson, 481 U.S. at 206; United States v. Sepulveda, 15 F.3d 1161, 1185 (1st Cir. 1993).

The appellant's related argument — that the jury likely perceived his comment that "the judge forced him to go to trial" as an admission of guilt — suffers from a lack of development. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (elucidating need for "developed argumentation").  While the appellant asserts that the words "impl[y]" his guilt, he does not give any rationale for the self-serving claim that such an implication was inherent in his remark.  And in any event, the district court's prophylactic instruction sapped the force of anything that was said.  It is, therefore, unsurprising that similar statements by defendants in other cases have been held not to mandate the declaration of a mistrial.[7]  See, e.g., McCormac, 309 F.3d at 625 (discussing defendant's vocal refusal to proceed with trial because it was "a biased situation"); Harris, 2 F.3d at 1454 (finding district court acted appropriately in denying

---

[7] In an effort to construct an off-ramp, the appellant cites Arizona v. Washington, 434 U.S. 497 (1978).  This off-ramp goes nowhere:  the Court's opinion in Washington addressed prejudicial conduct by defense counsel, to the detriment of the prosecution. See id. at 499-500.  Nothing comparable occurred here.

mistrial after defendant asserted in front of jury that "he was being tried against his will").

In sum, the appellant's outburst in the courtroom may have placed him in an unflattering light. But if that is so, the appellant was the architect of his own misfortune. Faced with an incipient problem of the appellant's contrivance, the able district court handled the matter with considerable circumspection. The court's prompt intervention and its carefully chosen words minimized any potential for prejudice. We thus discern no abuse of discretion in the court's denial of the appellant's motion for a mistrial.

**VII**

The next stop on our itinerary brings us to the appellant's claims of improper vouching. As relevant here, vouching occurs when a prosecutor tries to bolster the government's case by implying "personal belief in a witness's veracity or [suggesting] that the jury should credit the prosecution's evidence simply because the government can be trusted." United States v. Rodríguez-Adorno, 695 F.3d 32, 40 (1st Cir. 2012) (quoting United States v. Valdivia, 680 F.3d 33, 49 (1st Cir. 2012)). So, too, vouching may occur when the trial judge's comments convey this same sort of message. See Rush v. Smith, 56 F.3d 918, 921-22 (8th Cir. 1995) (explaining that "the influence of the trial judge on the jury is necessarily and properly of great

weight" and that the judge's "lightest word or intimation is received with deference, and may prove controlling" (quoting Starr v. United States, 153 U.S. 614, 626 (1894))).

Plotting the dividing line between permissible comments and impermissible vouching can be difficult. See United States v. Innamorati, 996 F.2d 456, 483 (1st Cir. 1993) (describing this line as "hazy"). Special caution is required in instances in which "[a] prosecutor flaunts the government's skills and purity of motive or where the context . . . impl[ies] private knowledge of the defendant's guilt that unfortunately cannot be shared with the jury." United States v. Gomes, 642 F.3d 43, 47 (1st Cir. 2011).

In this case, the appellant alleges that both the prosecutor and the court improperly vouched for the credibility of a cooperating witness (Dávila). The prosecutor, he avers, crossed the line by emphasizing during closing argument that Dávila was "required to tell the truth" as a condition of her plea agreement. The district court, he avers, crossed the line by describing Dávila as "a cooperator for the United States of America." The appellant exhorts us to find that each of these comments had the forbidden effect of placing the prestige of the United States behind Dávila's testimony.

The appellant made no contemporaneous objection to either of the comments that he now calumnizes.[8]  Our review, therefore, is for plain error.  See Duarte, 246 F.3d at 60.  Neither aspect of the appellant's vouching challenge clears this bar.

**A**

Dávila's plea agreement with the government was admitted into evidence without objection.  This is a salient fact because it is common ground that a prosecutor may "point[] to specific record evidence (e.g., a plea agreement), and suggest[] to the jury how these particular facts may have provided the witness with an incentive to testify truthfully."  United States v. Page, 521 F.3d 101, 107 (1st Cir. 2008); see United States v. Hansen, 434 F.3d 92, 101 (1st Cir. 2006).  Here, the prosecutor's challenged comment was of this genre:  the prosecutor merely restated a condition of Dávila's plea agreement, already in evidence, without incorporating either "personal assurances" or any suggestion that "facts not before the jury support[ed] the witness's testimony."  United States v. Rosario-Diaz, 202 F.3d 54, 65 (1st. Cir 2000).  Nor do we accept the appellant's argument, tendered without

_____

[8] Hernández did object to the prosecutor's statement on the ground of improper vouching.  But a codefendant's objection, without more, does not preserve any other defendant's claim of error.  See United States v. Flores-Rivera, 787 F.3d 1, 27 n.20 (1st Cir. 2015) (deeming claim unpreserved when appellant failed to join codefendant's objection); United States v. Acosta-Colón, 741 F.3d 179, 189 (1st Cir. 2013) (rejecting argument that codefendants may "piggyback" on each other's objections).

- 32 -

citation to any relevant authority, that the prosecutor's repetition of the information by some thaumaturgical alchemy transformed a proper statement into an improper one.

## B

The district court's description of Dávila as a "cooperator of the United States of America" was likewise permissible. This comment did no more than reiterate a fact already disclosed to the jury when Dávila testified. And nothing about the court's comment impermissibly placed the prestige of the United States behind the witness's forthcoming testimony. See United States v. Sutherland, 929 F.2d 765, 776 (1st Cir. 1991).

Here, moreover, the appellant's attack on the comment is an excellent example of the aphorism that no good deed goes unpunished. After all, the court made the statement while cautioning the jury not to either believe or disbelieve Dávila's testimony based simply on her status as a cooperating witness. The court went on to explain, in pertinent part, that "cooperators can be truthful, but they can also invent stories to help themselves." The propriety of this even-handed statement is apparent, and we discern no basis for a claim of error, much less plain error. See United States v. Mercado Irizarry, 404 F.3d 497, 502 (1st Cir. 2005); United States v. Dailey, 759 F.2d 192, 200 (1st Cir. 1985).

## VIII

We turn now to the appellant's claims of instructional error. There are two such claims, and we treat them separately.

### A

At trial, the appellant opted to testify. He asserts that the district court erred by instructing the jury to consider his testimony "in the same manner" as that of "any witness with an interest in the outcome of the case." In the appellant's view, this instruction unfairly tarnished his credibility by spotlighting his potential motive to deceive.

Because the appellant did not interpose a contemporaneous objection to this instruction, our review is for plain error. See United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001). The plain error hurdle, invariably high, "nowhere looms larger than in the context of alleged instructional errors." Id.; see United States v. McGill, 952 F.2d 16, 17 (1st Cir. 1991).

"[Appellate review] of jury instructions focuses on 'whether they adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.'" United States v. González-Vélez, 466 F.3d 27, 35 (1st Cir. 2006) (quoting Federico v. Order of Saint Benedict, 64 F.3d 1, 4 (1st Cir. 1995)). That review is context-dependent and must take into account the jury instructions as a whole. See United States v. Troy, 618 F.3d

27, 33 (1st Cir. 2010). Examined through this prism, the challenged instruction easily passes muster.

In rejecting this claim of error, we do not write on a pristine page: we defused a virtually identical argument in United States v. Gonsalves, 435 F.3d 64 (1st Cir. 2006). There, we elaborated upon the distinction between a permissible instruction that merely "call[s] attention to the testifying defendant's interest in the [case] outcome," id. at 72, and an impermissible instruction that unfairly belabors the defendant's interest in the outcome, see id. We made pellucid, however, that a garden-variety jury instruction that focused on the interests of a testifying defendant was appropriate and that only "egregiously phrased" instructions regarding a testifying defendant's credibility were to be avoided. Id. The instruction challenged here is not egregiously phrased but, rather, is modestly worded and appropriate in tone. Indeed, it closely tracks the instruction that we approved in Gonsalves, including the district court's important caution that the jury should not "disregard or disbelieve [Padilla-Galarza's] testimony simply because he is charged in the case." Plain error is plainly absent.

**B**

The appellant's second claim of instructional error is more troubling. As an outgrowth of his Bruton argument, see supra Part III, the appellant posits that the district court committed

an error of omission by failing to provide the jury with a needed limiting instruction. Specifically, he submits that the court should have advised the jury that the evidence of Hernández's out-of-court statements could not be used against the declarant's codefendant (namely, the appellant). Because no such limiting instruction was requested below, our review is once again for plain error. See Paniagua-Ramos, 251 F.3d at 246.

The first two elements of plain error are satisfied here. "[C]ase law unambiguously requires the trial court to instruct the jury that an out-of-court confession," when admitted under Bruton, "may not be considered as evidence against the declarant's codefendants." Vega Molina, 407 F.3d at 522; see Richardson, 481 U.S. at 211 ("[T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction . . . ."). Here, the government has confessed error: in its brief, "[t]he government recognizes that under [Vega] Molina, 407 F.3d at 521, the instruction should have been given." Gov't Br. at 80. Thus, we can safely assume, without further inquiry, that the district court's failure to supply the requisite limiting instruction constituted a clear and obvious error. See United States v. Rodríguez-Durán, 507 F.3d 749, 770 (1st Cir. 2007); Vega Molina, 407 F.3d at 521.

This brings us to the third element of plain error review, which demands an inquiry into whether the error "affected

[the appellant's] substantial rights." Duarte, 246 F.3d at 61. To satisfy this element, the appellant must provide an affirmative answer to the inquiry with "some level of certainty and particularity." United States v. Bramley, 847 F.3d 1, 7 (1st Cir. 2017). We conclude that the appellant has failed to shoulder this burden.

To establish that an error affected a defendant's substantial rights, the defendant must show a fair probability that, but for the error, the trial would have produced a different outcome. See United States v. Takesian, 945 F.3d 553, 566 (1st Cir. 2019). In other words, "a defendant must show . . . 'a reasonable probability' that the flawed instruction led to a flawed conviction." Id. (quoting United States v. Marcus, 560 U.S. 258, 262 (2010)).

In this instance, the record reflects, with conspicuous clarity, that the government's evidence against the appellant was powerful. This evidence included testimony by two cooperating witnesses (members of the gang) that the appellant played a central role in planning and orchestrating the plot; the fruits of the search of the appellant's home; receipts and surveillance footage that firmly linked the appellant to items used in the Banco Popular robbery; cell phone tower data that documented the appellant's proximity to the bank at the time of the offense; and the appellant's admission that he was the recent owner of the getaway

vehicle. Given this overwhelming evidence of the appellant's guilt, there is no reason to think that any impermissible inference that the jury might have drawn from the testifying agent's description of Hernández's confession would have been a determinative factor in the jury's decisional calculus. See Jones v. United States, 527 U.S. 373, 394-95 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights."); Vega Molina, 407 F.3d at 521 (holding absence of limiting Bruton instruction harmless when considered alongside "mass of other evidence"). Put another way, the appellant's claim of error fails because he has not shown that the omission of the limiting instruction affected his substantial rights. Thus, he has failed to satisfy the third element of plain error review.

## IX

We can make short shrift of the appellant's claim of cumulative trial error. Under the cumulative error doctrine, "a column of errors may [] have a logarithmic effect, producing a total impact greater than the arithmetic sum of its constituent parts." Sepulveda, 15 F.3d at 1196. In such rare instances, justice requires the vacation of a defendant's conviction even though the same compendium of errors, considered one by one, would not justify such relief. See United States v. Sampson, 486 F.3d 13, 51 (1st Cir. 2007).

Cumulative error claims are necessarily sui generis, and such claims are typically raised — as here — for the first time on appeal. Sepulveda, 15 F.3d at 1196. Consideration of such claims must proceed with an awareness that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986). Factors to be weighed in assessing the force of a claim of cumulative error include "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose . . . ; and the strength of the government's case." Sepulveda, 15 F.3d at 1196; see United States v. Villarman-Oviedo, 325 F.3d 1, 18 (1st Cir. 2003).

Here, the claim of cumulative error is fanciful. Cumulative error is by its very nature a derivative claim, that is, it is dependent upon the existence of error simpliciter. See Williams v. Drake, 146 F.3d 44, 49 (1st Cir. 1998). Error simpliciter is, in turn, a necessary — but not a sufficient — predicate for a valid claim of cumulative error. See, e.g., United States v. Rodriguez, 735 F.3d 1, 14 n.6 (1st Cir. 2013). In short, not every finding of error equates to a finding of cumulative error. See United States v. Rosario-Pérez, 957 F.3d 277, 302 (1st Cir. 2020).

In this case, the cumulative error doctrine simply does not fit. The myriad trial errors claimed by the appellant have

winnowed down to a single claim — the district court's failure to give a limiting instruction with respect to Hernández's statements, see supra Part VIII — and that claim has been adjudged insufficient, on its own, to warrant vacation of the jury's verdict. A fortiori, there is no legally sufficient basis for a finding of cumulative error. See United States v. DeMasi, 40 F.3d 1306, 1322 (1st Cir. 1994).

## X

Having completed our tour of the appellant's claims of trial error, we arrive at his four claims of sentencing error. Three of these claims pertain to the sentencing process and the fourth challenges the substantive reasonableness of the aggregate 228-month term of immurement.

The standard of review for preserved claims of sentencing error is abuse of discretion. See Gall v. United States, 552 U.S. 38, 56 (2007); United States v. Fields, 858 F.3d 24, 28 (1st Cir. 2017). We approach such claims through a two-step pavane. See United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008). "First, we address those claims that affect the procedural integrity of the sentence. Second, we address any residual question as to the substantive reasonableness of the sentence." Fields, 858 F.3d at 28 (quoting United States v. Rodríguez-Adorno, 852 F.3d 168, 175 (1st Cir. 2017)).

The starting point for most federal sentencing determinations is the calculation of the Guidelines Sentencing Range (GSR). See Gall, 552 U.S. at 40; United States v. Dávila-González, 595 F.3d 42, 47 (1st Cir. 2010). The sentencing guidelines, though, are advisory, and a sentencing court retains substantial discretion to vary up or down from the GSR based on the idiosyncratic circumstances of each offense and each offender. See United States v. Flores-Machicote, 706 F.3d 16, 20-21 (1st Cir. 2013); United States v. Ocasio, 914 F.2d 330, 336 (1st Cir. 1990).

Before us, the appellant does not dispute the district court's GSR calculations. When making those calculations, the court grouped the first four counts of conviction and set the GSR for each count at 87 to 108 months. Any sentence on count 1, however, was constrained by a 60-month statutory maximum. See 18 U.S.C. § 371. The court proceeded to impose a 60-month sentence on that count and top-of-the-range sentences of 108 months on counts 2, 3, and 4. All of these sentences were to run concurrently with each other.

The court treated count 5 independently. By statute, the court was required to sentence the appellant to at least 84 months in prison and to run the sentence on that count consecutively to the sentences on the other counts of conviction. See 18 U.S.C. § 924(c)(1)(A)(ii), (D)(ii). Moreover, the

sentencing guidelines adopt the statutory mandatory minimum as the GSR for the count 5 offense. See USSG §2K2.4(b). The court varied upward and imposed a 120-month incarcerative sentence on this count, running that sentence consecutively to the sentences imposed on the first four counts.

These sentencing determinations, in gross, yielded an aggregate 228-month term of immurement. In turn, this term of immurement was to be served consecutive to the sentence imposed in Criminal Case No. 15-78. See supra note 1.

**A**

The appellant's initial claim of sentencing error relates to the fact that he faced other charges in a separate proceeding, see supra note 1, apart from the charges that he faced in this case. With respect to those other charges, he went to trial and was convicted — prior to his trial in this case — on two counts: possession of ammunition by a convicted felon and possession of marijuana with intent to distribute. He was sentenced to serve a term of 46 months on the possession-of-ammunition count, and he argues that the court below committed procedural error by directing that the sentences it imposed in this case run consecutive to that sentence.

To put this claim of error into perspective, we must pause to explain the relevant conduct doctrine. Under the sentencing guidelines, disparate offenses may comprise "relevant

conduct" when they arise, say, out of a common scheme, plan, or course of activity. USSG §1B1.3 cmt. n.5. As relevant here, the key is whether the acts are "sufficiently connected or related to one another as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." Id. The guidelines provide that a defendant who receives a sentence while serving (or awaiting the start of) a previously imposed sentence for relevant conduct is entitled to certain benefits, one of which is having both sentences run concurrently. See id. §5G1.3(b)(2). The appellant asserts that his possession-of-ammunition conviction derives from the same "spree" as the offenses of conviction in this case and, thus, warranted concurrent sentencing. In support, he notes that the ammunition was seized during the bank-robbery investigation; that evidence regarding what was discovered in that search was adduced at trial in this case; that an FBI agent testified below that the seized ammunition was "relevant to the bank robbery investigation"; and that the presentence investigation report (PSI Report) in this case referred to the other case as a "related case." Summing up, he says that he was entitled to — but did not receive — the "relevant conduct" benefits at sentencing.

Although the sentencing court did not treat the earlier conviction as one for relevant conduct, the appellant's assignment of error does not get very far. The record makes manifest that

the appellant waived any relevant conduct argument. At the disposition hearing, the appellant's new counsel (a successor to his trial counsel but not his appellate counsel) offered only three arguments. None of these three arguments bore any relation to relevant conduct. Nor was this a mere fortuity: the attorney advised the court that, under ordinary circumstances, he would have contended that the other case "satisfies fully [as] relevant conduct." But he made it crystal clear that — at his client's direction — he was not advancing any such argument. Indeed, he went so far as to withdraw his original reference to relevant conduct, stating that he wanted to "take that away."

On this record, it plainly appears that the appellant knowingly relinquished any right to press a relevant conduct argument. For present purposes, that equates to a waiver. See, e.g., Coleman, 884 F.3d at 71-72 (deeming relevant conduct claim waived after defendant acknowledged potential claim at sentencing but did not pursue it); Rodriguez, 311 F.3d at 437 (explaining that identification and withdrawal of argument constitutes waiver). Consequently, the appellant's claim of error is by the boards.

**B**

The appellant's second claim of sentencing error centers on the Supreme Court's decision in Dean v. United States, 137 S. Ct. 1170 (2017). In Dean, the Court mulled whether a sentencing

- 44 -

court, when sentencing on counts that were not subject to a mandatory minimum, could take into consideration that the defendant already faced a mandatory minimum sentence on another count. See id. at 1174. There, the defendant was statutorily required to serve sentences for his two firearm offenses consecutive to any sentences imposed for the other charged counts. See id. at 1177. He asked the sentencing court to impose miniscule sentences on the remaining counts because he faced mandatory sentences totaling thirty years for the firearms offenses. See id. at 1175. The sentencing court declined, accepting the government's argument that it could not weigh the mandatory minimum firearms sentences in its sentencing calculus on the other counts. See id.

The Supreme Court took a different view. It held that, in the absence of explicit statutory language to the contrary, a sentencing court had discretion to consider the incidence of a mandatory minimum sentence when formulating a sentence for another charge in the same case. See id. at 1176.

Invoking Dean, the appellant complains that the court below erred in refusing his entreaties for a shorter sentence despite the fact that he faced a mandatory minimum sentence for his firearms conviction. See 18 U.S.C. § 924(c). He argues that, under Dean, his sentences on the remaining counts of conviction should have been reduced.

In support of this argument, the appellant first attacks the district court's factual findings. He maintains that the court mistakenly believed that the appellant had a second robbery conviction and relied on that mistake to justify sentences at the top of the applicable GSRs. The record tells a different tale. Although the court did inquire at one point whether the appellant had a prior robbery conviction, it received a clarifying negative response and — for aught that appears — that was the end of the matter. Given the lack of record support, we conclude that the appellant's attack is woven entirely out of flimsy strands of speculation and surmise. Therefore, we reject it.

Alternatively, the appellant suggests that the sentencing court improperly presumed that he would be found guilty in yet a third (impending) trial involving unrelated robbery and firearms charges: Criminal Case No. 15-633. This suggestion is empty. The court below acknowledged the appellant's upcoming trial in that case, referenced the presumption of innocence, and stated unequivocally that it "was not going [to] touch [the unadjudicated case] with a ten-foot pole." Nothing in the record provides the slightest indication that the court altered its resolve when fashioning the appellant's sentence.

Relatedly, the appellant says that the sentencing court misunderstood the law in deciding not to rely on the Dean rationale to shrink his sentences on counts 1 through 4. This claim of error

reads Dean through rose-colored glasses. The Dean Court established that a sentencing court "may consider" a related mandatory minimum in its ultimate sentencing determination on another count, Dean, 137 S. Ct. at 1177; see United States v. Matos-de-Jesús, 856 F.3d 174, 178 (1st Cir. 2017), but it did not require a sentencing court to discount every such sentence. The court below properly understood that it had discretion either to discount or not to discount its sentencing calculus pertaining to counts 1 through 4 on Dean grounds. See Dean, 137 S. Ct. at 1176-77; United States v. Blewitt, 920 F.3d 118, 122 (1st Cir. 2019). We find no abuse of discretion in the court's reasoned decision to decline the appellant's invitation to impose lower sentences on Dean grounds.[9]

## C

The appellant's third claim of sentencing error relates to his unsuccessful proffer of evidence of his "excellent institutional behavior." This proffer originated with the appellant's request, prior to sentencing, that the probation office memorialize in the PSI Report certain comments by a mental

---

[9] The sentencing court confronted this issue head-on and gave ample reasons for not employing the Dean rationale to reduce the appellant's sentences on counts 1 through 4. For instance, the court cited the appellant's "serious criminal record," his role as a "leader" of the gang, and the "emotional trauma and distress [that the robbery caused] bank employees and customers, including a pregnant lady."

health evaluator who had assessed the appellant's competency to stand trial in connection with Criminal Case 15-78. See supra note 1. The evaluator had reported that Bureau of Prisons (BOP) personnel had described the appellant as "very polite," "a pleasure to work around," and an "ideal" inmate whose interactions with others emphasized "respect." The probation office amended the PSI Report to include those statements.

At the disposition hearing, the sentencing court rejected the evaluator's report as hearsay when defense counsel attempted to highlight it. The appellant assigns error, arguing that the court based this rebuff on the erroneous legal conclusion that it was prohibited from considering hearsay evidence at sentencing.

We agree with the appellant's premise that hearsay evidence may sometimes be considered at sentencing. See United States v. Tardiff, 969 F.2d 1283, 1287 (1st Cir. 1992). We disagree, however, with the appellant's conclusion that the court below treated the hearsay nature of the proffer as a categorical bar. Hearsay evidence is admissible at sentencing only if and to the extent that the sentencing court concludes that it bears sufficient indicia of reliability. See United States v. Rodriguez, 336 F.3d 67, 71 (1st Cir. 2003) (stating that a sentencing court has "broad discretion" to consider hearsay evidence as long as it has "sufficient indicia of trustworthiness"); Tardiff, 969 F.2d at

1287 (similar). In this instance, the record reflects that the court was familiar with this principle; that it was aware that it had discretion either to admit or exclude the proffered hearsay evidence; that it examined the evidence and found it insufficiently reliable; and that it decided not to exercise its discretion in favor of admitting this particular hearsay evidence. Such a decision was well within the encincture of the court's discretion. See United States v. Cunningham, 201 F.3d 20, 26 (1st Cir. 2000).

We need not tarry. At sentencing, the Federal Rules of Evidence do not apply. See Rodriguez, 336 F.3d at 71. Instead, "the court has considerable leeway in deciding whether particular evidence is reliable enough for sentencing purposes." United States v. Mills, 710 F.3d 5, 16 (1st Cir. 2013). Such a reliability assessment must be undertaken on a flexible, case-specific basis, informed both by considerations of fairness and by the sentencing court's accumulated experience. See United States v. Brewster, 127 F.3d 22, 28 (1st Cir. 1997); United States v. Gonzalez-Vazquez, 34 F.3d 19, 25 (1st Cir. 1994).

In this case, the district court did not elaborate upon its reasons for concluding that the proffered evidence was not sufficiently reliable. Yet, the absence of specific findings is not fatal where, as here, the justification for the court's ultimate conclusion can easily be gleaned from the record. See United States v. Berry, 258 F.3d 971, 976 (9th Cir. 2001)

(declining to require "express factual findings regarding the reliability of . . . hearsay statements" at sentencing); United States v. Gordon, 231 F.3d 750, 761 (11th Cir. 2000) (concluding that such findings are not obligatory "where the reliability of the statements is apparent from the record").

The district court's justification is evident from the record, which reflects good reasons for the court to have refused to admit second-hand reports about the appellant's behavior. The court's statement that it "need[ed]" direct evidence of BOP employees' assessment of the appellant's behavior can most naturally be read as skepticism about the reliability of a particular piece of double-hearsay evidence, not as a categorical rejection of any and all hearsay evidence. Here, moreover, the court had case-specific reasons for this skepticism, given both the second-hand provenance of the proffer and the fact that the appellant's trial had been plagued by his out-of-control antics (which included "flushing the toilet every time [the judge] spoke, putting his hands in his ears, and trying to interrupt [the judge] with 'la la la la la la'"). The evaluator's report was the sole source of evidence concerning the alleged praise of the appellant by BOP personnel; the appellant offered no testimony, statements, or other evidence from the BOP staffers themselves. In declining to rely upon the proffered second-hand report, the district court took the entirely sensible position that it would need to hear

from the BOP personnel directly in order to credit the commendations.

This disposes of the third of the appellant's sentencing challenges. As we have said, a sentencing "court must take pains to base sentencing judgments upon reliable and accurate information." United States v. Tavano, 12 F.3d 301, 305 (1st Cir. 1993). So it was here.

### D

The appellant's final shot across the sentencing bow implicates the substantive reasonableness of his aggregate sentence. The concept of a substantively reasonable sentence is a protean one: "[t]here is no one reasonable sentence in any given case but, rather, a universe of reasonable sentencing outcomes." United States v. Clogston, 662 F.3d 588, 592 (1st Cir. 2011). The twin hallmarks of a substantively reasonable sentence are a "'plausible sentencing rationale' and a 'defensible result.'" United States v. Miranda-Díaz, 942 F.3d 33, 42 (1st Cir. 2019) (quoting Martin, 520 F.3d at 96).

The appellant laments that a 228-month aggregate custodial sentence is unreasonable because it is the "equivalen[t] of a life sentence" for an older man whose crimes did not result in serious physical injury. He adds that the sentencing court overstepped by sentencing him at the top of the applicable GSRs

for counts 2 through 4 and imposing a 36-month upward variance for count 5.

We review the appellant's plaint for abuse of discretion, bearing in mind "the totality of the circumstances." United States v. Perretta, 804 F.3d 53, 57 (1st Cir. 2015). This is a deferential standard, and "it is not a basis for reversal that we, if sitting as a court of first instance, would have sentenced the defendant differently." United States v. Madera-Ortiz, 637 F.3d 26, 30 (1st Cir. 2011) (quoting Martin, 520 F.3d at 92). Though we do not presume that a sentence within the advisory range is per se defensible, see id. at 30, "a defendant who attempts to brand a within-the-range sentence as unreasonable must carry a heavy burden," United States v. Pelletier, 469 F.3d 194, 204 (1st Cir. 2006).

Here, the concurrent sentences on counts 1 through 4 all fall within the applicable GSR. The district court stated explicitly that it reached these determinations only after considering the factors limned in 18 U.S.C. § 3553(a), and we must take that statement at face value. See Dávila-González, 595 F.3d at 49; United States v. Rivera-Berríos, 902 F.3d 20, 27 (1st Cir. 2018). The court deemed sentences at the high end of the range appropriate (subject, of course, to the statutory maximum that applied to count 1) in view of the appellant's serious criminal history, his status as a former police officer, his prominent

leadership role in organizing the criminal enterprise, the deleterious impact of the offenses on the individual and institutional victims, the firepower mustered by the gang, and the need to safeguard the public from likely recidivism. Although the appellant may disagree with the relative weight that the court assigned to these factors as opposed to the weight that it assigned to potentially mitigating factors, disagreement over the court's "choice of emphasis" is not enough to undermine an otherwise plausible sentencing rationale. United States v. Ledée, 772 F.3d 21, 41 (1st Cir. 2014) (quoting United States v. Ramos, 763 F.3d 45, 58 (1st Cir. 2014)).

Largely the same compendium of factors informed the court's decision to vary upward with respect to the firearms conviction. To be sure, a sentence that varies upward from the guideline range requires more explanation than a sentence within the range. See Rita v. United States, 551 U.S. 338, 357 (2007); United States v. Gonzalez-Flores, __ F.3d __, __ (1st Cir. 2021) [No. 18-1607, 19-1118, slip op. at 2]. Here, however, the court's reasoning was adequate to satisfy this heightened standard. Cf. United States v. Vargas-Dávila, 649 F.3d 129, 131 (1st Cir. 2011) ("[A]n increased sentence is necessarily a judgment call and, within wide limits, deference is due to the trier's on-the-spot perceptions."). After all, the armed robbery of the bank involved the brandishing of three firearms and easily could have resulted

in bystander injuries. The plot also involved the planting of fake bombs — a cruelly cynical method of distraction. Given the totality of the circumstances, the district court's rationale for its modest upward variance on count 5 was within the realm of plausibility. See id. at 132.

So, too, the aggregate sentencing outcome fell within the wide universe of reasonable sentencing outcomes. On balance, the period of incarceration, though lengthy, is proportionate to the serious nature of the crimes committed and the characteristics displayed by the offender, especially since the appellant was the apparent mastermind of the criminal scheme. The appellant's age — he was 52 years old at the time of sentencing — is not a significantly countervailing factor. See Pelletier, 469 F.3d at 204 (rejecting 55-year-old defendant's age-based challenge to 151-month sentence); see also United States v. Pacheco-Martinez, 791 F.3d 171, 180 (1st Cir. 2015) ("[A]ge could cut both ways in the sentencing calculus. . . . [P]ersons convicted of a crime late in life may be unlikely to recidivate . . . [b]ut it is also true that 'engaging in criminal activity at such an age provides evidence that [the defendant] may be one of the few oldsters who will continue to engage in criminal activity until [he] drop[s].'" (sixth, seventh, and eighth alterations in original) (quoting United States v. Johnson, 685 F.3d 660, 662 (7th Cir. 2012))).

The short of it is that the district court offered a plausible rationale for the aggregate sentence and that sentence achieved a defensible result. The appellant's claim of substantive unreasonableness is therefore meritless.

**XI**

The sentencing court directed the appellant (along with the others convicted of the bank robbery charge, jointly and severally) to pay $64,000 in restitution to Banco Popular. The appellant contests this restitution order.

The restitution order was issued in pursuance of the Mandatory Victims Restitution Act (MVRA), which authorizes a sentencing court to order a defendant to make restitution when an identifiable victim suffers a pecuniary loss as a result of a defendant's criminal conduct. See 18 U.S.C. § 3663A(a)(1), (c)(1)(B). Importantly, the MVRA only reaches monetary losses that a victim has actually sustained. See United States v. Flete-Garcia, 925 F.3d 17, 37 (1st Cir. 2019). The thrust of the appellant's assignment of error is that the court ordered him to pay more than the victim of the robbery (Banco Popular) actually lost.

"We review restitution orders for abuse of discretion, examining the court's subsidiary factual findings for clear error and its answers to abstract legal questions de novo." United States v. Chiaradio, 684 F.3d 265, 283 (1st Cir. 2012); see Flete-

- 55 -

Garcia, 925 F.3d at 37. The threshold that must be crossed in order to validate a restitution order is familiar: the government must carry the burden of demonstrating a proximate, but-for causal nexus between the offense of conviction and the actual loss for which restitution is ordered. See United States v. Alphas, 785 F.3d 775, 786 (1st Cir. 2015); United States v. Cutter, 313 F.3d 1, 7 (1st Cir. 2002). This standard is relatively modest in application, as "a modicum of reliable evidence" may suffice both to establish the requisite causal connection and to justify a dollar amount. Flete-Garcia, 925 F.3d at 37 (quoting United States v. Vaknin, 112 F.3d 579, 587 (1st Cir. 1997)); see United States v. Salas-Fernández, 620 F.3d 45, 48 (1st Cir. 2010) ("[A] restitutionary amount must have a rational basis in the record.").

Seen in this light, the appellant's assignment of error is all meringue and no pie. It is uncontradicted that the appellant's coconspirators left Banco Popular with slightly more than $64,000 in purloined funds ($64,633.13, according to the testimony of a percipient witness). Thus, the sentencing court had before it more than a modicum of evidence to support the factual premise of its restitution order.

The appellant struggles to portray subsequent events as mitigating the loss and vitiating the force of the government's evidence. He observes that some money was recovered from the crime scene and the abandoned getaway car. He also observes that the

bank was federally insured and, thus, eligible for reimbursement of any stolen funds from the Federal Deposit Insurance Corporation (FDIC). The court below found these additional facts insufficient to warrant either the elimination of restitution or a reduction in the restitutionary amount. So do we.

To be sure, some bags of money were discarded as the robbers fled and anti-theft devices implanted in the bags did their work. By like token, damaged bills were found in the abandoned getaway car. But testimony in the record supported (and no testimony contradicted) a conclusion that the discarded money had been functionally destroyed in the process.[10] It is abject speculation, unsupported by the record, to insist that these damaged bills were somehow capable of rehabilitation and reuse. Indeed, it would defy common sense to think that something like a gentle rinse cycle would do the trick; a readily reversible anti-theft dye would serve little purpose.

Nor is the appellant's conjecture that the bank may have recovered a few stray bills undamaged by the anti-theft devices sufficient to undermine the district court's findings. Where, as here, the government has made a prima facie showing of a victim's actual loss through competent evidence, a defendant must do more

_____

[10] FBI agents and Puerto Rico police officers described the bills discovered near the bank building and inside the getaway car as "dye-stained" and "all [] tinted."

- 57 -

than speculate about the possibility of mitigation in order to obtain an offset. See United States v. Dickerson, 909 F.3d 118, 129-30 (5th Cir. 2018); United States v. Steele, 897 F.3d 606, 613 (4th Cir. 2018). He must, at a minimum, point to evidence adequate to support a finding of a proposed offset in a specific amount. See Flete-Garcia, 925 F.3d at 38; United States v. González-Calderón, 920 F.3d 83, 86 (1st Cir. 2019). The appellant identifies no such evidence in this record.

The appellant's reliance on the putative availability of FDIC reimbursement is equally misplaced. Congress has made it nose-on-the-face plain that a court may not reduce the amount of restitution otherwise due under the MVRA because "a victim has received or is entitled to receive compensation with respect to a loss from insurance or any other source." 18 U.S.C. § 3664(f)(1)(B); see United States v. Gallant, 537 F.3d 1202, 1253 (10th Cir. 2008). It follows inexorably that the court below did not err in declining to offset either FDIC insurance proceeds or the possible future recoupment of such proceeds against the restitutionary amount.[11]

---

[11] For the sake of completeness, we note that the FDIC itself may properly qualify as a victim eligible to receive restitution. See Vaknin, 112 F.3d at 591. In such a situation, only the recipient of the restitution would change as the FDIC "would step into the victim['s] shoes as a subrogee of [its] restitution claims." United States v. Bright, 353 F.3d 1114, 1122 (9th Cir. 2004).

To sum up, the appellant's grumbling about the district court's factfinding rings hollow. The restitution order is adequately supported by the record, and we uphold it.

## XII

In a final jab, the appellant lambastes his trial counsel's performance. He contends, citing book and verse, that Carrillo afforded him ineffective assistance of counsel in derogation of his Sixth Amendment rights. See U.S. Const. amend. VI; see also Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

This claim of error is better left for another day. It was not made squarely in the district court, and "[w]e have held with a regularity bordering on the monotonous that fact-specific claims of ineffective assistance cannot make their debut on direct review of criminal convictions." United States v. Mala, 7 F.3d 1058, 1063 (1st Cir. 1993); see United States v. Tkhilaishvili, 926 F.3d 1, 20 (1st Cir. 2019); United States v. Santana-Dones, 920 F.3d 70, 82 (1st Cir. 2019). This prudential precept has a practical rationale: ineffective assistance claims "typically require the resolution of factual issues that cannot efficaciously be addressed in the first instance by an appellate tribunal." Mala, 7 F.3d at 1063. The trial court, by contrast, has a superior vantage from which to "assess both the quality of the legal representation afforded to the defendant in the district court and the impact of any shortfall in that representation." Id. The

upshot is that a defendant who wishes to press a newly minted ineffective assistance of counsel claim — like the appellant — ordinarily must raise it in a collateral proceeding brought in the district court under 28 U.S.C. § 2255. See Santana-Dones, 920 F.3d at 82; Jones, 778 F.3d at 389.

We say "ordinarily" because there is an exception to the Mala rule. United States v. Miller, 911 F.3d 638, 642 (1st Cir. 2018); United States v. Natanel, 938 F.2d 302, 309 (1st Cir. 1991). Under this exception, an appellate court may proceed to determine the merits of an ineffective assistance claim in the first instance "where the critical facts are not genuinely in dispute and the record is sufficiently developed to allow reasoned consideration." Miller, 911 F.3d at 642 (quoting Natanel, 938 F.2d at 309). The exception, though, is narrow, and its applicability depends on the particular circumstances of a given case. See id.

The case at hand does not fit within the cramped confines of the exception. Although the appellant complained about his trial counsel several times in the proceedings below, the district court's responses were guarded. Moreover, the record before us does not illuminate critical parts of the necessary inquiry. For example, information about why counsel either took or did not take certain actions is scarce. So, too, the district court has made no detailed appraisal of the lawyer's performance. Given these significant gaps, the record is insufficiently developed to permit

an informed determination as to whether trial counsel provided an obviously difficult client (the appellant) with the constitutionally required level of effective assistance. See United States v. Wyatt, 561 F.3d 49, 52 (1st Cir. 2009). Attempting to adjudicate the appellant's ineffective assistance of counsel claim without additional information would, therefore, be tantamount to "playing blindman's buff." Mala, 7 F.3d at 1063.

For these reasons, we dismiss the appellant's ineffective assistance of counsel claim, without prejudice to his right to pursue it in a proceeding for post-conviction relief under 28 U.S.C. § 2255.

## XIII

We need go no further. For the reasons elucidated above, we affirm the judgment of the district court; provided, however, that the appellant's ineffective assistance of counsel claim is dismissed without prejudice, leaving him free to pursue that claim, should he so desire, in a collateral proceeding brought pursuant to 28 U.S.C. § 2255.


**So Ordered**.